**Case Nos. 25-2548, 25-2558, 25-2565, and 25-2575**

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf of S.M., a minor, and S.M.,

PLAINTIFFS-APPELLEES,

v.

KRIS KARCHER, KIP OSWALD, ERIC SCHWENNINGER,
and CRAIG ZANNI,

DEFENDANTS-APPELLANTS.

---

On Appeal from the United States District Court for the District of Oregon
Case Nos. 6:20-cv-01163-MTK; 3:21-cv-1719-MTK (Eugene)
Honorable Mustafa T. Kasubhai, United States District Judge

---

**CONSOLIDATED OPENING BRIEF OF KRIS KARCHER, KIP OSWALD,
ERIC SCHWENNINGER, and CRAIG ZANNI,
DEFENDANTS-APPELLANTS**

---

**Sarah R. Henderson     OSB #153474**
Email: shenderson@franzlaw.comcastbiz.net
Franz & Henderson
P.O. Box 62
Springfield, OR 97477
Telephone: (541) 741-8220
 Of Attorneys for Defendants-Appellants

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................ 1

STATEMENT OF JURISDICTION .................................... 2

ISSUES PRESENTED FOR REVIEW ................................ 2

STATEMENT OF THE CASE ............................................. 4

    **A. Nature of the Case and the Course of the Proceedings** ......... 4

    **B. Statement of Relevant Facts** ...................................... 10

SUMMARY OF ARGUMENT ............................................. 17

STANDARD OF REVIEW .................................................. 18

ARGUMENT. ...................................................................... 18

    **A. Defendants are Entitled to Qualified Immunity on S.M.'s Fourteenth Amendment Claim.** ........................... 19

        1. *There was no Constitutional Violation* ........................... 19

        2. *Constitutional Violation Not Clearly Established* .......... 25

    **B. Defendants are Entitled to Qualified Immunity on Plaintiff McGuffin's Fourteenth Amendment Denial of Due Process Claim (Count 1).** ........................... 26

        1. Defendant Karcher. ........................................... 27

            *a. Karcher did not fabricate evidence regarding the position of Freeman's body; and, even if her description of the position of the body was materially incorrect, which it was not, this is not material in any way to McGuffin's prosecution or*

ii

*conviction for killing Freeman.* ...................................... 28

 *b. Karcher did not fabricate evidence of a path in the foliage where Freeman's body was found; and, if she had, this is not material in any way to McGuffin's prosecution or conviction for killing Freeman.* ............................... 34

 2. <u>Defendant Schwenninger</u>. .................................... 37

**C. Defendants are Entitled to Qualified Immunity on Plaintiff McGuffin's Fourth and Fourteenth Amendment Claims (Counts 2 & 3).** .................................... 47

**D. Defendants are Entitled to Qualified Immunity On Plaintiff McGuffin's Fourteenth Amendment Due Process Claim (Count 4).** ........................................ 51

**E. Defendants are Entitled to Qualified Immunity on Plaintiff McGuffin's Fourteenth Amendment Due Process Claim (Count 5).** ................................ 53

**F. Defendants are Entitled to Qualified Immunity on Plaintiff McGuffin's Fourteenth Amendment Due Process Claim (Count 6).** ................................ 56

**G. Defendants are Entitled to Qualified Immunity on Plaintiff McGuffin's Fourteenth Amendment Due Process Claim (Count 7).** ............................... 56

**CONCLUSION** ................................................................ 59

iii

# TABLE OF AUTHORITIES

**Cases**       Page

*Ashcroft v. al-Kidd,* 563 U.S. 731 (2011). ...............................................18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)......................................................2

*Behrens v. Pelletier*, 516 U.S. 299 (1996)..................................................8

*Black v. Montgomery Cnty.*, 835 F.3d 358 (3d Cir. 2016).......................27

*Bradford v. Scherschligt*, 803 F.3d 382 (9th Cir. 2015).........................26

*Chambers v. Sanders*, 63 F.4th 1092 (6th Cir. 2023)...........................21-24

*Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556 (2024)...................47

*Claybrook v. Birchwell,* 199 F.3d 350 (6th Cir. 2000)...........................23

*Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101
    (9th Cir. 2009)......................................................................................26

*Crowson v. Washington Cnty. Utah*, 983 F.3d 1166 (10th Cir. 2020)....8-9

*Cunningham v. Gates*, 229 F.3d 1271 (9th Cir. 2000)...........................7-8, 47
                                                      49, 53-55

*Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991)...................24, 25

*Estate of Hernandez by & through Hernandez v. City of Los Angeles,*
    139 F.4th 790 (9th Cir. 2025)..........................................................24-25

*Foos v. City of Delaware,* 492 Fed. Appx. 582 (6th Cir. 2012).............23

*Galbraith v. City of Santa Clara*, 207 F.3d 1119 (9th Cir. 2002)..........26

*Gantt v. City of Los Angeles*, 717 F.3d 702 (9th Cir. 2013)...................21

*Gausvik v. Perez*, 345 F.3d 813 (9th Cir. 2003)....................................26-27

iv

*Gorman v. Rensselaer County*, 910 F.3d 40 (2d Cir. 2018)...................23-24

*Halsey v. Pfeiffer*, 750 F.3d 273 (3rd Cir. 2014)...................................27, 45

*Hicks v. City of Philadelphia*, 783 F.Supp.3d 834 (E.D. Pa. 2025)........27

*Jaco v. Bloechle,* 739 F.2d 239, 241 (6th Cir. 1984)..............................23

*LeFever v. Ferguson,* 645 Fed. Appx. 438, 447–48 (6th Cir. 2016).......23

*Lewis v. Tripp*, 604 F.3d 1221 (10th Cir. 2010)......................................8-9

*Lyman v. County of Geary*, 2025 WL 2855388 (D. Kan. Oct 8, 2025)...27, 56

*Malley v. Briggs*, 475 U.S. 335 (1986)....................................................18

*Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 367 (2017) .........................47

*McCurdy v. Dodd*, 352 F.3d 820 (3d Cir. 2003)......................................24

*Mervilus v. Union Cnty.*, 73 F.4th 185, 194-95 (3d Cir. 2023)................27

*Miles v. Clackamas Cnty.,* 3:23-CV-01805-SB,
     2025 WL 305578 (D. Or. Jan. 27, 2025)......................................21

*Musso v. Hourigan*, 836 F.2d 736 (2d Cir. 1988) ...................................55-56

*Ochoa v. City of Mesa*, 26 F.4th 1050 (9th Cir. 2022)............................21, 25

*Partridge v. City of Benton, Arkansas,* 929 F.3d 562 (8th Cir. 2019)......24

*Pittsley v. Warish,* 927 F.2d 3 (1st Cir. 1991).........................................23

*Purnell v. City of Akron,* 925 F.2d 941 (6th Cir.1991).............................23

*Reichle v. Howards*, 132 S. Ct. 2088 (2012)............................................18

*Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005)............................................24

v

*Saucier v. Katz,* 533 U.S. 194 (2001)........................................18

*Scott v. Harris*, 550 U.S. 372 (2007).........................................8-9, 19, 32

*Smith v. City of Fontana,* 818 F.2d 1411, 1418 (9th Cir. 1987)..............20, 21

*Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017)............................26-27

*Stephenson v. California*, 761 F. Supp. 3d 1242 (C.D. Cal. 2025)..........8, 49, 56

*Stephenson v. McKee*, 2025 WL 1143493 (9th Cir. 2025).......................8

*Strickler v. Greene*, 527 U.S. 263 (1999)...................................52 54

*Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014).......................................21

*Tiner v. Premo*, 391 P.3d 816 (2017) ......................................41

*U.S. v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013)........................................58

*United States v. Koon*, 34 F.3d 1416 (9th Cir.1994) ..............................54

*Washington v. Glucksberg*, 521 U.S. 702 (1997)...................................22, 24-25

*Wilkins v. City of Oakland*, 350 F.3d 949 (9th Cir. 2003).......................18, 25

*Williams v. MCI-Shirley Medium Superintendent*, 2025 WL 2823322 (D. Mass. Oct 3, 2025)............................................52

*Wilson v. Layne*, 526 U.S. 603 (1999)................................................ 26

## United States Constitution

Fourth Amendment, United States Constitution....................................3, 47

Fourteenth Amendment, United States Constitution.............................*passim*

vi

**Federal Statutes and Rules**

28 U.S.C. § 1291......................................................................................2

28 U.S.C. § 1331......................................................................................2

28 U.S.C. § 1343......................................................................................2

28 U.S.C. § 1367......................................................................................2

42 U.S.C. § 1983.........................................................................2, 4, 5, 7,
18, 23, 56

Fed. R. App. Proc. 4 ...............................................................................2

Fed. R. Civ. Proc. 56..............................................................................19

## INTRODUCTION

On June 28, 2000, 15-year-old Leah Freeman disappeared in her hometown of Coquille, Oregon. Her boyfriend Nicholas McGuffin, then 18 years old, told police he was supposed to pick her up at a friend's house at 9 p.m., but when he arrived, she had already left on foot. McGuffin claims he never saw Freeman again. On August 3, 2000, Leah Freeman's badly decomposed remains were found down a steep embankment next to the Coquille River, nine miles from Coquille. The case went cold later that year.

The case was reopened in 2008, and in 2010, McGuffin was indicted by a grand jury for the murder of Freeman. In 2011, he was convicted by a jury of the lesser-included offense of Manslaughter. As a result of his petition for post-conviction relief, on November 26, 2019, McGuffin was granted a new trial based upon a finding of ineffective assistance of his trial counsel, and a *Brady* violation by the Oregon State Police Lab. District Attorney Paul Frasier declined to retry McGuffin.

On July 20, 2020, McGuffin and his minor daughter, S.M., filed this lawsuit alleging that several other members of state and local law enforcement, fabricated, withheld, suppressed, or destroyed evidence in a conspiracy to bring charges against him. (2-ER-65)

2

## STATEMENT OF JURISDICTION

The district court had federal jurisdiction over Plaintiffs' action based upon 42 U.S.C. § 1983, under 28 U.S.C. §§ 1331 and 1343(a)(3), and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).

The Court of Appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. This appeal is from a denial of qualified immunity to Defendants-Appellants; thus, the basis for jurisdiction of this appeal is the collateral order doctrine. *See Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009).

Defendants Karcher, Oswald, Schwenninger, and Zanni are appealing the District Court's Opinion and Order dated July 2, 2025 (1-ER-2-63; Doc. No. 385), which denied qualified immunity to each of them. (1-ER-54-55) Defendants filed their Notices of Appeal (4-ER-729-812), which were deemed filed on July 2, 2025, pursuant to Fed. R. App. Proc. 4(a)(2) (Dkt Entry: 13.1), within the 30-day deadline of Fed. R. App. Proc. 4(a)(1).

## ISSUES PRESENTED FOR REVIEW

1.  Are Defendants entitled to qualified immunity on Plaintiff S.M.'s Fourteenth Amendment liberty interest claim (Count 9) for a loss of companionship, society, and comfort between herself and her father, Nicholas McGuffin?

3

2. Are Defendants entitled to qualified immunity on Plaintiff McGuffin's Fourteenth Amendment Due Process Claim (Count 1) when there is no evidence that each deliberately fabricated evidence to convict McGuffin?

3. Are Defendants entitled to qualified immunity on Plaintiff McGuffin's Fourth and Fourteenth Amendment Due Process Claims (Counts 2 and 3) when there is no evidence that each maliciously prosecuted him or otherwise illegally detained him?

4. Are Defendants entitled to qualified immunity on Plaintiff McGuffin's Fourteenth Amendment Due Process Claim (Count 4) when there is no evidence that each failed to disclose exculpatory evidence to the prosecutor?

5. Are Defendants entitled to qualified immunity on Plaintiff McGuffin's Fourteenth Amendment Due Process Claim (Count 5) where there is no evidence that they had the duty and opportunity to intervene in the deprivation of McGuffin's constitutional rights?

6. Are Defendants entitled to qualified immunity on Plaintiff McGuffin's Fourteenth Amendment Due Process Claim (Count 6) where there is no evidence that each participated in a conspiracy to frame McGuffin?

7. Are Defendants entitled to qualified immunity on Plaintiff McGuffin's Fourteenth Amendment Due Process Claim (Count 7) where there is no evidence that each destroyed exculpatory evidence?

4

## STATEMENT OF THE CASE

### A.  Nature of the Case and the Course of the Proceedings.

This case is an appeal from a denial of qualified immunity on the Plaintiffs' claims arising under 42 U.S.C. § 1983. The Plaintiffs, Nicholas McGuffin and his minor daughter, S.M., brought this lawsuit against the City of Coquille, Coos County, the City of Coos Bay, and several individuals employed by those entities who were involved in some way in the investigation of the death of Leah Freeman in June of 2000.

Plaintiffs' Second Amended Complaint contains eight claims for relief. (2-ER-65) At issue in this appeal are eight of the nine counts of Plaintiffs' first claim for relief which is based upon 42 U.S.C. § 1983: Count 1, "Violation of Fourteenth Amendment" (2-ER-96); Count 2, "Malicious Prosecution" (2-ER-97); Count 3, "Illegal Pretrial Detention Following the Issuance of Legal Process" (2-ER-98); Count 4, "Failure to Disclose Exculpatory Information" (2-ER-99); Count 5, "Failure to Intervene" (2-ER-100); Count 6, "Conspiracy" (2-ER-100); Count 7, "Destruction of Exculpatory Evidence" (2-ER-101); and Count 9, "Violation of S.M.'s Fourteenth Amendment Rights." (2-ER-105)

In their Second Amended Complaint, Plaintiffs claim that Karcher destroyed a "Crime Scene Tape," purportedly showing the scene where Leah Freeman's body was found. (2-ER-75)

5

Plaintiffs allege that Oswald, who found one of Freeman's shoes in a remote area outside of town, failed to preserve evidence related to the finding of the shoe. (2-ER-70-71)

As to Defendant Schwenninger, Plaintiffs make no specific allegations of wrongdoing against him at all in their Second Amended Complaint. Rather, the allegations are that the "Defendants" (not saying which Defendant) did certain acts or did not do certain acts.

Plaintiffs allege that Zanni suppressed evidence related to a witness, Nick Backman, who reported having seen Freeman the night of her disappearance. (2-ER-91-92)

Defendants filed a motion for summary judgment (Doc. No. 281) as to Plaintiffs' Section 1983 claims, contending that they are each entitled to qualified immunity. (Doc. No. 281 at 50)

In response to Karcher's motion, Plaintiffs argued an unpled theory that Karcher fabricated evidence about the position Freeman's body on the steep embankment in the wooded area next to the river (1-ER-24-25), and evidence about the disruption to the foliage adjacent to the road above where the body was found. (1-ER-25-26)

As to the alleged destruction of the "the crime scene tape," Plaintiffs assert that Karcher checked the crime scene video tape out of evidence just

6

prior to her traveling to England to hand deliver the clothes and shoes of Leah Freeman to the United Kingdom National Forensic Science Service Laboratory; but instead of also delivering the tape to the FSS Lab as the lab had requested, Karcher destroyed the tape, but delivered the clothes and shoes. (1-ER-36)

As to Oswald, Plaintiffs offered an expert's opinion that Oswald either destroyed or failed to preserve "key pieces of evidence" in the area of the location where Freeman's left shoe was found in the wooded area known as Hudson Ridge. (1-ER-30-31)

As to Schwenninger, Plaintiffs argued that he "worked with former lead case officer Hall to approach Richard Bryant—Hall's stepson—who shared a cell with McGuffin in county jail in 2002," he caused Bryant to testify falsely; and in so doing, Schwenninger "fabricated evidence that McGuffin knew the location of Freeman's body before it was found" and "suppressed evidence that [Bryant] was getting information from [Hall]." (1-ER-27)

Regarding Zanni, Plaintiffs' theory that Zanni suppressed the Backman report failed because it is undisputed that the report was produced to District Attorney Paul Frasier, fulfilling any obligation of Zanni under *Brady*. (1-ER-34) As to Plaintiffs' theory that Zanni also suppressed a report of an interview with witness David Jenkins, the Plaintiffs contend Zanni violated *Brady*

7

because the report was impeachment evidence as to witness Richard Bryant. (1-ER-31)

The district court adopted Plaintiffs' version of events as fact, despite being unsupported by any admissible evidence and despite being blatantly contradicted by the record. In addition, the district court found that a finding that one Defendant violated a constitutional right of McGuffin meant that each of the other Defendants also violated the same constitutional right, without any further proof of any such conduct by each of other Defendants.

The Defendants now request this Court to reverse the trial court's decision and grant summary judgment to Karcher, Oswald, Schwenninger, and Zanni on all of Plaintiffs' Section 1983 claims, keeping in mind the following established legal principles.

First, the case law required the district court to separately set forth the specific facts of what each named "Defendant" actually did that resulted in a constitutional violation, not what the "Defendants" allegedly did.

> Once the defendant asserts qualified immunity, the burden is on the plaintiff to prove both elements. ... When considering whether qualified immunity applies to members of a group, the actions of each must be considered separately. *Cunningham v. Gates*, 229 F.3d 1271, 1287 (9th Cir. 2000), *as amended* (Oct. 31, 2000) ("In resolving a motion for summary judgment based on qualified immunity, a court must carefully examine the specific factual allegations against each individual defendant (as viewed in a light most favorable to the plaintiff).").

8

*Stephenson v. California*, 761 F. Supp. 3d 1242, 1261 (C.D. Cal. 2025), *appeal dismissed sub nom. Stephenson v. McKee*, 25-336, 2025 WL 1143493 (9th Cir. Apr. 8, 2025); *See Cunningham v. Gates*, 229 F.3d 1271, 1282 (9th Cir. 2000), *as amended (Oct. 31, 2000)* [Finding: "The district court never conducted an individualized analysis to determine whether each moving defendant was entitled to qualified immunity based on his or her individual actions."] As stated in *Lewis v. Tripp*, 604 F.3d 1221, 1225–26 (10th Cir. 2010):

> First, the Court has indicated that, when the district court at summary judgment fails to identify the particular charged conduct that it deemed adequately supported by the record, we may look behind the order denying summary judgment and review the entire record de novo to determine for ourselves as a matter of law which factual inferences a reasonable jury could and could not make. *See Behrens v. Pelletier*, 516 U.S. 299, 312–13, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); see also Johnson, 515 U.S. at 319, 115 S.Ct. 2151 (If a district court does not state the facts a reasonable jury could find at summary judgment, "a court of appeals may have to undertake a cumbersome review of the record to determine [those] facts.").

The second legal principal is that this Court can look beyond the holding of the district court when a version of an event the district court finds a reasonable jury could credit "is blatantly contradicted by the record." As stated in *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1177 (10th Cir. 2020):

> There is an exception to this jurisdictional limitation "when the 'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record.'" *Lewis v. Tripp*, 604 F.3d 1221, 1225–26 (10th Cir. 2010) (quoting *Scott v. Harris*,

9

550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). In such circumstance, we assess the facts de novo. *Id.*

Simply stated, the basis for this appeal is threefold. First, as to the first prong of the qualified immunity analysis, the district court failed to engage in the required specific inquiry into the conduct of each individual defendant; rather, the district court found the conduct of another Defendant no longer a party to this case binding upon the Defendants on this appeal. Further, even assuming the Plaintiffs' blatantly contradicted version of the facts were plausible, the district court failed to connect those facts to the actions of each of the Defendants on appeal, individually.

Second, the undisputed material facts in the record before this Court "blatantly contradict" the findings of the district court; and thus, such findings are appropriate for a *de novo* review by this Court as to each of the appealing Defendants.

Finally, the district court failed to properly assess the clearly established law prong of the qualified immunity analysis. Instead, the district court viewed the clearly established law at an inappropriately high degree of generality, without a determination as to each Defendant on appeal that a reasonably competent police officer would have believed that the actions each Defendant took were not within clearly established constitutional limits.

10

## B. Statement of Relevant Facts.

On June 28, 2000, 15-year-old Leah Freeman ("Freeman") went missing in her hometown of Coquille, Oregon. (1-ER-3)

McGuffin grew up in Coquille, Oregon, and attended Coquille High School, where he and Freeman met and began dating. (1-ER-3) In the summer of 2000, Freeman was fifteen years old and had recently finished her freshman year of high school; McGuffin was eighteen years old and had just graduated. (1-ER-3)

On June 28, 2000, at around 7:00 p.m., McGuffin dropped off Freeman at the home of Freeman's friend, Cherie Mitchell. McGuffin claims that this was the last time he ever saw Freeman. (1-ER-3-4)

On June 29, 2000, at around 7:30 a.m., Freeman's mother called McGuffin and reported that Freeman had not come home the previous night. (1-ER-6) Freeman was first reported missing to the Coquille Police Department later that morning. (1-ER-6)

In 2000, Kip Oswald was a Coos County Sheriff's Deputy. (3-ER-536) His first involvement in the Freeman investigation occurred on July 5, 2000. (1-ER-6) That day, Oswald learned that Freeman had gone missing the previous week. (3-ER-536) Later, while patrolling Hudson Ridge, a remote forested area where teenagers were known to party, Oswald turned up a dirt road and found a

11

white Nike tennis shoe lying in the road. (3-ER-574) He initially picked up the

shoe with his bare hands. (3-ER-542) The shoe was later determined to be Leah

Freeman's left shoe. (1-ER-6) In the days that followed, Deputy Oswald

returned to Hudson Ridge twice and searched the area where he had found the

shoe. (3-ER-590; 3-ER-543) He took photographs of the area and located

several items of potential evidentiary value including a receipt, a length of duct

tape hanging from a tree, spent .22 cartridges, and towelettes with unknown

residue, all of which he placed into evidence. (3-ER-590; 3-ER-544-552) In

addition, the Coquille case officer noted:

> Since the discovery of these shoes, there have been searches of the
> areas where they were found. On Hudson Ridge, in addition to a
> search by law enforcement personnel, specially trained dogs used
> to find cadavers were also employed. Nothing of interest was
> found." (3-ER-569)

Deputy Oswald had no further noteworthy involvement in the Freeman

investigation.

Prior to August of 2000, Kris Karcher was an Assistant Chief Deputy

Medical Examiner for Coos County. (2-ER-127) On August 4, 2000, she

became the full-time Chief Deputy Medical Examiner for Coos County. (2-ER-

160)

On August 3, 2000, Karcher teamed up with three detectives from the

Coos Bay and North Bend Police Departments to assist with the investigation

12

into Freeman's disappearance. (2-ER-162) While searching along Lee Valley Road, a logging road that parallels Coquille River (2-ER-338), one of the detectives discovered the remains of Freeman in an advanced state of decomposition. (1-ER-24)

Lieutenant James Pex, a criminalist with the Oregon State Police, responded to the scene at approximately 4:50 p.m. and began directing the processing of the scene. (2-ER-289) Karcher assisted Lt. Pex but did not write up her own report. (1-ER-24) Photographs of the body and the surrounding scene were taken. (2-ER-196) At approximately 6 p.m., the body was removed and placed in a body bag for transport to Roseburg, Oregon for autopsy. (2-ER-156)

Lt. Pex authored a report documenting the processing of the scene, signed and dated August 4, 2000. (2-ER-289) In this report, he included a hand-drawn diagram and made the following notes regarding the location of the body and the surrounding area:

> 5 pm on scene, body down over the hill to north of roadway. Road was gravel plants crushed next to roadway above her. Difficult to see her, she is in the shadows. Barely see blue jeans (2-ER-291).

His report also states that he was going to obtain video of the scene. (2-ER-289). On August 7, 2000, an item of evidence described as a "Video Tape of Crime Scene" is delivered to Coquille Police Department by Coos County Det.

Sgt. Zanni and logged into evidence by Officer Hall-Evidence No. 224. (2-ER-346)

Lt. Pex authored a Supplemental Report dated August 8, 2000, wherein he describes the scene as follows:

> Close examination of the site revealed the deceased was twenty feet over the embankment. The roadside plants were matted near the body with a narrow trail leading to the gravel roadway. The deceased was lying parallel to the road with her head slightly lower than her feet. A sock was visible on one foot and the other foot was bare. Other clothing consisted of a pair of blue denim pants that were buttoned and a grey colored shirt. The shirt color may not have been original. Her left arm was across her chest and the right arm was folded under her. Her legs were also crossed (2-ER-156).

On September 21, 2000, Craig Zanni and Deputy Downing interviewed David Jenkins at the Coos County Jail. (3-ER-615) They were following up on a tip from Kimberly Peet, who had reported that on August 22, 2000, she overheard a conversation at a party between Jenkins and Nick McGuffin where Jenkins "asked Nick about him getting carried away with strangling Leah." (3-ER-615) Jenkins admitted to being at the party and reported that "[t]here was a conversation between David Jenkins and Richard Bryant about Leah, because Richard had heard a lot of stuff from his dad and was blabbing his mouth." (3-ER-615) Richard Bryant is the stepson of former Coquille Officer Hall, who was the case officer on the Freeman investigation in 2000. (3-ER-628) Zanni's report of this interview, which was in the form of a completed tip sheet on an

14

Oregon State Police carbon triplicate form, was returned to Coquille PD as established by the fact that the district court found that the report was in the possession of Coquille Police Officer McNeely after the Freeman case was re-opened. (1-ER-31) Coquille PD's complete case files, including all reports and evidence, were available to DA Frasier. (3-ER-611)

In March of 2001, Karcher was preparing to travel to England to hand deliver items of evidence to the FSS laboratory in Chorley, England. (1-ER-36) Karcher had recently learned from a speaker at a conference she attended that the FSS lab was performing forensic DNA testing that was more sensitive than any that could be performed locally. (2-ER-198) In addition to physical evidence, the FSS had also requested to review any "[s]cene photographs and video." (2-ER-309) On March 22, 2001, Karcher checked out Coquille Police evidence Item No. 223 "Video Tape of Crime Scene." (2-ER-346) Karcher then traveled to England, arriving in time for a same-day briefing with FSS lab personnel. (2-ER-296)

In 2008, when the investigation was re-opened, it was discovered that the materials that had been delivered to the FSS lab were still in England. (2-ER-349) Karcher contacted the FSS lab and requested that the materials be sent back to no avail. (2-ER-348) Eventually, Paul Frasier got involved, and the FSS lab finally mailed back the clothes and shoes of Freeman. The video, however,

15

was never returned into evidence. (2-ER-346) The UK Forensic Science Service, as of 2012, no longer exists. (1-ER-36) The evidence in the record of what the video would have shown includes the photographs taken at the same time (2-ER-289-292), as well as accounts from other people on scene detailed *infra*.

From September 16, 2002, to September 24, 2002, Richard Bryant and Nick McGuffin were housed in the same jail cell at the Coos County Jail. (1-ER-27) (3-ER-409-410) Bryant and McGuffin "hung out quite a bit, you know, talked a lot. Did some illegal things, you know. Doing drugs, drinking, stuff like that, you know."  (3-ER-421-422)

Bryant testified at the 2010 Grand Jury that during the time they were in jail together, McGuffin told Bryant that: "I can just – I can see her laying there and I couldn't do anything to help her, and I can't do anything about it." (1-ER-27) At the criminal trial in 2011, Bryant testified that "[McGuffin] was crying and telling me that, you know, he can picture her laying there and her head sitting on a rock and there was nothing he could do about [it]." (1-ER-27)

Eric Schwenninger's first involvement in the Freeman investigation was in 2010. Schwenninger did not testify at any grand jury proceedings relating to Leah Freeman, and he did not testify at the criminal jury trial of Nick McGuffin. (3-ER-352)

16

On March 2, 2010, David Hall and Schwenninger had a telephone conversation about Hall's involvement in the initial stages of the Freeman investigation. (3-ER-396) Hall explained his involvement, and at the end of the conversation Hall suggested that his stepson, Richard Bryant, be interviewed:

> "Hall explained Richard ran with many of the involved people back then and may have heard some "jailhouse talk" at one point. He stated Richard was not cooperative back then but has cleaned up since." (3-ER-396)

After leaving his employment with the City of Coquille on April 26, 2002, Hall worked for the Black Butte Ranch Police Department from November 15, 2002, to September 25, 2010. (3-ER-396)

Schwenninger never interviewed Bryant or talked to Bryant because Bryant had already been interviewed by Oregon State Trooper John Riddle on January 25, 2010 (3-ER-528-529) and January 27, 2010 (3-ER-529-530), weeks before Schwenninger's telephone conversation with Hall.

On August 23, 2010, McGuffin was indicted by the Grand Jury for Coos County (2-ER-115); and then arrested pursuant to an arrest warrant. (2-ER-121) By that time, Defendants Oswald and Zanni had retired from the Coos County Sheriff's Office.

/

/

/

## SUMMARY OF ARGUMENT

Defendants Karcher, Oswald, Schwenninger, and Zanni are entitled to qualified immunity on both prongs of the immunity analysis on the record before this Court because the district court did not engage in the particularized analysis as to each individual defendant in denying them qualified immunity on each claim brought against them. On many counts the district court made no factual determinations at all as to the actions of the individual Defendants on appeal; rather, relying on supposed issues of fact involving other defendants no longer parties to this lawsuit, the district court inappropriately attributing those facts to the "Defendants" collectively.

In addition, no reasonable jury could credit the Plaintiffs' version of events in the first instance, because the version is blatantly contradicted by the undisputed material facts in the record. The district court's crediting of Plaintiffs' version of events amounted to pure speculation, rather than reasonable inferences.

Finally, where the district court did make specific factual determinations as to the actions of Karcher, Oswald, Schwenninger, and Zanni, those actions did not violate clearly established constitutional rights of the Plaintiffs, because none of the supposed genuine issues of fact that the district court found are material in any way to McGuffin's claims.

18

## STANDARD OF REVIEW

A district court's denial of summary judgment based on qualified immunity is reviewed *de novo*. *Wilkins v. City of Oakland*, 350 F.3d 949, 954, (9th Cir. 2003).

## ARGUMENT

In an action based upon 42 U.S.C. § 1983, an individual defendant is not liable if he is entitled to qualified immunity. *Reichle v. Howards,* 132 S. Ct. 2088, 2093 (2012). Assessing whether an official is entitled to immunity is a two-prong inquiry. Under the first prong the court asks whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional, right?" *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Under the second prong the court examines whether the right was clearly established. *Id.*

If officers of reasonable competence could disagree on the issue presented, then immunity should be recognized. *Saucier v. Katz*, 533 U.S. 194, 202 (2001) "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question **beyond debate."** (Bold emphasis supplied.) *Ashcroft v. al–Kidd,* 563 U.S. 731, 741. Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

19

A plaintiff faced with the qualified immunity defense in a motion for summary judgment cannot rely upon the allegations of the complaint, and the plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380–81.

On appeal in a qualified immunity case, this Court may review "the district court's factual determination if that determination is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007). As discussed below, both the Plaintiffs' version of the facts and the district court's ensuing factual determination are blatantly contradicted by the record and thus reviewable by this Court. In addition, even if this Court did not have jurisdiction to determine the genuineness of the supposed issues of fact herein, it does have jurisdiction to determine their materiality. Fed. R. Civ. Proc. 56(c).

**A. The Defendants are Entitled to Qualified Immunity on S.M.'s Fourteenth Amendment Claim.**

1. *There was no Constitutional Violation*.

Plaintiff S.M., a minor, has brought a Fourteenth Amendment substantive due process claim based upon her alleged right to a familial relationship with her father, Plaintiff McGuffin. Her claim is for injuries collateral to the alleged violation of her father's constitutional rights. She does not contend that the Defendants on appeal took any action against her, much less that they

20

intentionally took any action against her; and she does not claim that the Defendants on appeal intended to interfere with her relationship with McGuffin. Rather, she contends that because Defendants violated *her father's* constitutional rights leading to his wrongful conviction, the Defendants likewise violated her right to familial integrity. She makes this contention against each of the Defendants, even though she was not even born when Defendants Oswald and Zanni allegedly violated the constitutional rights of her father in 2000. (S.M. was born in October of 2007-Dkt. No. 330-10, Ex. 10 at 8) Since S.M. was not even born, Oswald and Zanni could not have done anything directed at the familial relationship between S.M. and McGuffin.

Pursuant to the holding in *Smith v. City of Fontana,* 818 F.2d 1411, 1418 (9th Cir.1987), the district court in the case at bar denied the Defendants' motion for summary judgment because it found that there was a dispute as to whether the Defendants had violated the constitutional rights of McGuffin causing his wrongful conviction. It is the Defendants' position that it does not matter if there is a dispute as to whether Defendants violated the constitutional rights of McGuffin, because S.M.'s claim fails since (1) it is undisputed that there is no evidence that any of the Defendants intended to interfere with the father-child relationship of S.M. and McGuffin, at any time; and (2), none of the Defendants' conduct came close to "shocking the conscience."

21

Defendants acknowledge the Ninth Circuit's holding in *Smith v. City of Fontana,* 818 F.2d 1411, 1418 (9th Cir. 1987), that a minor child's interest in the continued companionship and society of her father is a cognizable liberty interest under the substantive due process clause of the Fourteenth Amendment where the child's father is shot and killed by a police officer; thus, that the child could bring her own action against the police officer. In other words, in this Circuit, a minor can bring a lawsuit for the loss of the companionship of her parent by alleging a police officer violated the parent's constitutional rights via conduct that shocked the conscience. *Ochoa v. City of Mesa*, 26 F.4th 1050, 1057 (9th Cir. 2022).

> In this context, the Ninth Circuit defines "deliberate indifference" as "the conscious or reckless disregard of the consequence of one's acts or omissions." *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014) (quoting *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013)). "It entails something more than negligence but ... less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*

*Miles v. Clackamas Cnty.,* 3:23-CV-01805-SB, 2025 WL 305578, at *7 (D. Or. Jan. 27, 2025).

After this Circuit's holding in *Smith,* other circuits have held to the contrary, following the traditional rule requiring proof that the police officer intended to interfere with the parent-child relationship. For example, the Sixth Circuit in *Chambers v. Sanders*, 63 F.4th 1092 (6th Cir. 2023), held that no

constitutional violation of the right to family association exists without a state action directed at the family relationship. Because the children in *Chambers* did not assert that the actions of the police defendants were directed at breaking up the family unit, the holding in *Chambers* aligns with United States Supreme Court's precedent requiring that state action be directed at the family relationship to constitute a constitutional violation. *Smith's* broader approach of allowing a claim for a child as the result of a collateral injury to a parent is inconsistent with this requirement of an intent to interfere and should be overruled.

The Supreme Court has repeatedly emphasized that Fourteenth Amendment substantive due process rights must be "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *See Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). The specific right recognized in *Smith*—a child's independent constitutional claim for loss of companionship due to a parent's deprivation by the state, even absent direct state action against the child—lacks clear historical or textual support. *Chambers* correctly applies *Glucksberg* by requiring state action directed at the family relationship itself, not merely at the parent:

> The Ninth Circuit's analysis is flawed in both respects. First, as already discussed, the Supreme Court has cautioned against such broad interpretations of rights under the due process clause. *See Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258. Second, the Ninth

23

Circuit mischaracterizes the legislative history on which it relies.

63 F.4th 1092, 1099 (6th Cir. 2023).

Also, as stated in *LeFever v. Ferguson*:

> But *Smith* is at odds with our precedents. Claims under § 1983 are personal to the party injured by a constitutional violation. *See Jaco v. Bloechle,* 739 F.2d 239, 241 (6th Cir.1984). Indeed, we have repeatedly found that § 1983 provides no relief for injuries collateral to the violation of another person's constitutional right. *Claybrook v. Birchwell,* 199 F.3d 350, 357 (6th Cir.2000) ("[O]nly the purported victim, or his estate's representative(s), may prosecute a section 1983 claim; conversely, no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members."); *see also Foos v. City of Delaware,* 492 Fed.Appx. 582, 592–93 (6th Cir.2012). In fact, we juxtaposed the Ninth Circuit's holding in *Smith* that § 1983 allows children to assert claims for deprivation of the parent-child relationship with our conclusion that "section 1983 provides a cause of action which is *personal* to the injured party." *Purnell v. City of Akron,* 925 F.2d 941, 948 n. 6 (6th Cir.1991).
>
> Because Alex alleges that the defendants violated his right to familial integrity by trampling *his mother's* constitutional rights leading to her wrongful conviction, he raises a non-cognizable claim for a collateral injury.

645 Fed. Appx. 438, 447–48 (6th Cir. 2016).

Several other Federal circuits have issued decisions supporting the holding in *Chambers*: *Pittsley v. Warish,* 927 F.2d 3, 8 (1st Cir. 1991) ("[I]n order to establish a violation of a right to familial associational privacy, the state action must be directly aimed at the parent-child relationship"); *Gorman v. Rensselaer County*, 910 F.3d 40, 48 (2d Cir. 2018) (A due process claim for

24

infringement of the right to familial association requires an allegation that state action was specifically intended to interfere with the family relationship); *McCurdy v. Dodd*, 352 F.3d 820 (3d Cir. 2003) (Official actions not directed at the parent-child relationship do not constitute a due process violation); *Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005) (declining to find a violation of the familial liberty interest where the state action was not aimed specifically at interfering with the relationship); *Partridge v. City of Benton, Arkansas,* 929 F.3d 562, 568 (8th Cir. 2019) (Fourteenth Amendment claims by the parents of a minor for loss of familial companionship were foreclosed because the state action was not intentionally directed at their relationship with their son).

Further, the Honorable Ryan D. Nelson of this Circuit acknowledged *Chambers* in his Concurrence in *Estate of Hernandez v. City of Los Angeles* (Hernandez's minor daughter asserted a substantive due process right to companionship of her father, after her father was shot by a police officer):

> But Plaintiffs' substantive due process claims fail for a more fundamental reason. We seem to have stumbled our way into recognizing the substantive due process rights of parents to the companionship of their adult-children and of children to the companionship of their parents. After *Washington v. Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), our unreasoned decisions assuming such rights require reexamination.
>
> * * *
>
> After years of stacking unreasoned precedent upon unreasoned precedent, it is now blackletter law in this circuit that a child has a constitutionally recognized interest in the companionship of her

25

parents. *See, e.g., Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).

There is reason to doubt that such a right exists under *Glucksberg*. 139 F.4th 790, 812–14 (9th Cir. 2025).

Further, even if the standard set forth in *Smith* is still good law, none of Defendants' conduct towards McGuffin "shocks the conscience;" thus, they are entitled to qualified immunity on that basis alone.

Finally, because there was no violation by the Defendants of the constitutional rights of McGuffin, as discussed *infra*, S.M.'s claim must be dismissed because it is entirely based upon the premise that her father's constitutional rights were violated.

2. *Constitutional Violation Not Clearly Established.*

There is no doubt that the constitutional violation at issue was not and is not clearly established in the Federal Circuits of the United States. While the violation under the standard in *Smith* may be established in this Circuit, a public official's liability under a Constitution that applies equally to all government officials in the United States should not depend upon the location of the official's conduct. In the case at bar, the Defendants would be entitled to qualified immunity on S.M.'s claim in every state of the United States, except for those states located within the Ninth Circuit. "If judges thus disagree on a

26

constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999).

**B. Defendants are Entitled to Qualified Immunity on McGuffin's Fourteenth Amendment Denial of Due Process Claim (Count 1).**

In a deliberate fabrication of evidence claim, a plaintiff must identify the "evidence he contends the government deliberately fabricated," then show (1) the defendant acted deliberately in falsifying evidence, and (2) the intentional fabrication was the proximate and but-for cause of the plaintiff's deprivation of liberty. *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015); *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017); *Galbraith v. City of Santa Clara*, 207 F.3d 1119, 1126 (9th Cir. 2002). Deliberately fabricating evidence is not equivalent to instances where an officer "carelessly handled the facts and the investigation." *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003) (careless inaccuracy by officer in probable cause affidavit inadequate under stringent standard for deliberate fabrication claim). Mistakes of "tone," or "characterization" are insufficient, rather Plaintiff must show actual misrepresentations. *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1113 (9th Cir. 2009). Relatedly, an investigator's statements of their subjective opinions about an element of a criminal investigation cannot constitute "fabrication," and statements that are merely careless or inaccurate do not

27

suffice. *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017), *citing Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003).

And in all cases, a plaintiff must prove the fabricated evidence was demonstrably false. As stated in *Hicks v. City of Philadelphia*:

> To prevail, a plaintiff must show (1) that the defendant offered false evidence knowingly, willfully, or with reckless disregard for the truth; and (2) causation, i.e., that there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted. *Id.* at 294-95; *Mervilus v. Union Cnty.*, 73 F.4th 185, 194-95 (3d Cir. 2023). Evidence is not fabricated if it is "incorrect or simply disputed." *Halsey*, 750 F.3d at 295. And the causation prong requires a "meaningful connection" between the use of fabricated evidence and the conviction. *Id.* at 294 n.19; see *Black v. Montgomery Cnty.*, 835 F.3d 358, 372 (3d Cir. 2016).

783 F.Supp.3d 834, 851 (E.D. Pa. 2025). The district court made factual findings relevant to fabrication of evidence claims only against Defendants Karcher and Schwenninger. No such findings were made as to Defendants Oswald and Zanni; thus, Oswald and Zanni are entitled to qualified immunity as to this count. Defendants Karcher and Schwenninger are also entitled to summary judgment as follows.

1. <u>Defendant Karcher</u>.

Plaintiffs have alleged a direct—not a circumstantial—fabrication claim against Karcher. That is, Plaintiffs allege that Karcher personally fabricated evidence.

28

The Plaintiffs' first contention is that Karcher described the position of Freeman's body in a manner that was incorrect. The evidence Plaintiffs offered to support this claim consists of grand jury and trial testimony for which Karcher is immune from liability. (1-ER-26) To get around this, Plaintiffs allege that Karcher deliberately fabricated the *narrative*, at some time between 2000 and 2010, which she later presented at grand jury and at trial. (1-ER-26) The district court adopted this "constructing a false narrative" version in its finding that the evidence could show that Karcher "conducted the investigation with a reckless disregard for the truth." (1-ER-26) Based upon this finding, the district court denied Karcher qualified immunity. This was error, because it has nothing to do with the fabrication claim made against Karcher. Again, she is alleged to have *directly* fabricated evidence; she is *not* alleged to have elicited false evidence by coercion or abuse.

> *a. Karcher did not fabricate evidence regarding the position of Freeman's body; and, even if she had, this is not material in any way to McGuffin's prosecution for killing Freeman.*

Karcher's testimony about the position of Freeman's body cannot be the basis of a fabrication of evidence claim because there is no evidence in the record that it was fabricated. Freeman's remains were photographed extensively both prior to removal and during the autopsy. (2-ER-163, 194; 3-ER-357) The

29

position of the body is clearly documented. Karcher described the position of

Leah Freeman's body as it was found to the Grand Jury in 2010 as follows:

> She appeared to have like rolled down the bank. She was laying on her back, but one arm was kind of underneath her, one arm was across the front of her. (2-ER-163).
> * * *
> Grand Juror: Her legs crossed over, like she just --
> Karcher: Mm-hmm. (2-ER-179-180)

This description is identical to the description by Lt. Pex in his report dated

August 8, 2000:

> Her left arm was across her chest and the right arm was folded under her. Her legs were also crossed.

(2-ER-156) In addition, both the Grand Jury and the criminal trial jury were

provided photographs of Freeman's body in the position it was found. (2-ER-

163, 194-195) Karcher's testimony regarding the positioning of the body

referenced the photographs:

> Q. And State's Exhibit No. 42?
>
> A. That's the body from about the neck down. This is a foot that has no sock on it. And it's kind of mummified. And then this is the other leg that — the left leg crosses over the right leg.
>
> Q. And State's Exhibit No. 43?
>
> A. Also of the body. This is the head — Leah's head. Her mouth is open, blonde hair.
>
> Q. And finally, State's Exhibit No. 44?

30

A. That's just a closer of her head. It also shows her left arm. Her left arm was kind of laying over her chest. Her right arm was kind of underneath her back.

Q. And what does that suggest to you, one arm over the chest and the other arm under the back?

A. That she rolled down this embankment.  (2-ER-194-195)

Lt. Pex's testimony at the trial also suggested that the position of the body indicated that Freeman had been "dumped" and rolled:

Q. Now, in your career as a forensic scientist, have you ever had cases where the homicide occurred at one location but the body ends up at the second location?
A. Oh, sure.

Q. And what do we — what do they commonly refer to this as?
A. Dumped body.

Q. In examining this scene and the position of the body and so forth, did you come to a conclusion in your opinion as to was this where Leah Freeman died, or something?
A. That isn't always easy to establish. The one thing that I noticed right away is that her legs were crossed. And that is often an indication that someone has been rolled over. Whether rolled over going down the embankment, or rolled over on the site, I don't know. But, when you turn someone who is laying on their back, for example, or laying on their stomach and you grab them by the shoulders, the upper body, and roll them over, it causes the legs to cross. That doesn't — that's an indication. That's not absolute, but it's something you notice. And based upon her position and its relationship to the road, it had the appearance of having been a dead — deposed at that site as a dumped body. But, that's not absolute.  (2-ER-232-233)

31

This testimony is consistent with the description by Karcher, and what is depicted in photographs. It is also consistent with the description of the body by Dr. Olson, the medical examiner:

> The body is essentially in the position in which it was found. The right arm is twisted or bent in an awkward position at the shoulder. It extends posteriorly with the head resting against the shaft of the humerus it then is sharply bent at the elbow and sharply bent at the wrist joint, the hand coming to rest beneath the right shoulder. The left arm is extended to approximately the mid-abdomen level. The forearm bends at approximately 90 degrees and rests on the volar surface across the upper abdomen and lower chest. The hand is acutely flexed.
>
> ...
>
> The right leg is bent at the knee acutely and extends towards the left of the body. It is bent at 90 degrees. The left leg rests, at the knee, over the right foot. (2-ER-148)

Dr. Olson testified consistently at the criminal trial:

> Q. Dr. Olson, could you describe for the jury what you did in examining this body?
> A. What I did was, basically, take it as I saw it, layer by layer, and describe the body in the position, roughly, that we received it. The right arm was up and behind the body in kind of an unusual, awkward position. The left was resting across the front of the body, about the abdomen, lower chest level. (3-ER-360)

Dr. Olson also testified that there was "no question that she's dumped in an area that was probably intended to, hopefully, conceal her remains, perhaps indefinitely." (3-ER-373)

Based upon the foregoing, it is undisputable that when found, Leah Freeman's left arm was in front of her, bent at the elbow and resting on her

chest; her right arm was folded under her; and her left leg was crossed over her right leg. If the defense disagreed with this opinion at McGuffin's criminal trial, they could have rebutted it with their own expert or simply taken Karcher on during cross-examination. Further, the Plaintiffs' allegation that evidence was fabricated to assert that the disposal of Leah Freeman's body was done "hastily" is unavailing. Karcher neither fabricated evidence nor testified to any such thing. Her testimony was limited to describing the position of the body as shown in a photograph and opining as to what the position of the body was indicative of.

Finally, because of the other testimony of Dr. Olson and Lt. Pex, there was no "reasonable likelihood that, without the use of" Karcher's testimony McGuffin "would not have been convicted." The same testimony by Olson and Pex proved that the testimony of Karcher was not only true, but her testimony did not cause the conviction of McGuffin.

Further, we have here a scenario akin to what is addressed in *Scott*, *supra*. The content of the written accounts and the testimony that was given by each of the individuals who observed Freeman's body when it was found, to include Karcher, are materially indistinguishable. Plaintiffs' allegation, and the district court's ensuing assumption that the accounts are "inconsistent" is reviewable because it is blatantly contradicted by the record.

33

Karcher's description of the position of the body—even if incorrect in some material way, which it was not—does not implicate McGuffin; rather, it simply provides context to what is known about the crime—specifically, the possibility that Freeman may have been killed elsewhere and her body transported to the location where it was found. McGuffin's criminal defense team did not dispute this narrative at trial. On cross-examination of Lt. Pex, attorney McCrea for McGuffin asked:

> Q. Okay. And then it would also be important, especially in a situation such as this, where you've indicated that it appeared to be a dumped body, - - -
> A. (Interposing) Yes.
>
> Q. That's such an awful term.
> A. It is. It really is.
>
> Q. - - - well, that there was transfer from one place to another?
> A. Yes. (2-ER-245)

The attorneys for McGuffin then seized onto this narrative to pursue their theory that a lack of physical evidence found in McGuffin's car suggested that he was not responsible for transporting Freeman's body to the location where Freeman's body was dumped. (2-ER-246-250)

It is undisputed that no evidence connecting McGuffin—or anyone else—to the murder of Freeman was located at the scene where her body was found. Thus, nothing about what was observed at the scene bore any causal relationship to McGuffin being prosecuted for the crime.

34

Thus, as to the Plaintiffs' first contention of fabrication, Karcher is entitled to qualified immunity under the first prong of the qualified immunity inquiry because there was no violation of the Fourteenth Amendment by Karcher.

Along these lines, it should be noted that Plaintiffs' version of events as laid out in their response to Karcher's motion for summary judgment is simply false. Plaintiffs contended in their response that Karcher reported, at some unspecified time, that Freeman's right arm was around her torso, despite the fact that she knew the autopsy report describes the right arm as "extending up at the shoulder...and coming to rest behind the right shoulder." The truth of the matter is that Karcher never reported any such thing.

First, Karcher never made any report, much less a report as alleged by the Plaintiffs. Second, as detailed above, Karcher took photographs of the scene. At grand jury and trial, along with such photographs, Karcher described Freeman's right arm as "folded under her" as she observed the body *in situ*. Plaintiffs' misrepresentations of what Karcher reported does not create an issue of fact.

> *b. Karcher did not fabricate evidence of a path in the foliage above where Freeman's body was found; and, if she had, this is not material to McGuffin's prosecution for killing Freeman.*

Plaintiffs' version of the facts here are similarly in conflict with the record. Plaintiffs contend that the first time anyone ever mentioned a path in the

foliage above the body was at Grand Jury in 2010. (2-ER-286) This is false. As

noted *supra*, Lt. Pex made contemporaneous handwritten notes documenting his

observation of the disturbed foliage above the body and attached them to his

report dated August 4, 2000. Specifically, his notes state that the "plants [were]

crushed next to the roadway above her." (2-ER-291) Lt. Pex then elaborated

further in his report of August 8, 2000, stating that "[t]he roadside plants were

matted near the body with a narrow trail leading to the gravel roadway." (2-ER-

156) Detective Wetmore observed the same disturbed foliage after stringing up

crime scene tape immediately after discovering Freeman's body:

> "We found that there's essentially a break in the weeds as if at
> least on person or several people-that's unknown-but somebody or
> something had traveled through the brush there.  There was an
> obvious part and the vegetation that was moved aside as if
> somebody had went through that area.  (2-ER-273)

Finally, the disturbed foliage can be seen in a photograph taken by

Karcher the day of the discovery of Freeman's body and prior to its removal.

The photograph was introduced into evidence at the criminal trial as State's

Exhibit 39 (2-ER-344) In the photograph, one can see the body of Freeman and

the path.

Thus, because the disturbed foliage can be seen in a photograph and was

referred to by Lt. Pex and Detective Wetmore, there was no "reasonable

likelihood that, without the use of" Karcher's testimony McGuffin "would not

have been convicted." Further, the existence of the disturbed foliage in the photograph, and the fact the disturbed foliage was referred to by Pex and Wetmore, proves that the testimony of Karcher was not only true, but that her testimony did not cause the conviction of McGuffin.

The only thing Plaintiffs could muster to support their position that Karcher fabricated the existence of a path in the foliage above Freeman's body was a handwritten note purportedly dating to late 2009, over nine years after the existence of the disturbed foliage was first documented by Pex. The note itself is of unknown authorship, and it is unclear how it could properly be admitted at trial. The district court erred in its finding that this note created a genuine issue of material fact as to Karcher's alleged fabrication of the path in the foliage. On the record before this Court, no reasonable jury could conclude that the path of disturbed foliage was fabricated by anyone, and certainly not by Karcher.

Finally, even if Karcher had fabricated evidence of a path of disturbed foliage on the side of the road, this would not be material to whether she violated the constitutional rights of anyone, because the existence or nonexistence of a path in the foliage above where the body was found does not implicate McGuffin or anyone else.

Because Plaintiffs' version of the facts is blatantly in contradiction with every admissible account of the facts that exist in the record before this Court,

Karcher is entitled to qualified immunity since no constitutional violation took place.

Karcher is also be entitled to qualified immunity under the second prong of the inquiry because the law was not clearly established that Karcher would violate the constitutional rights of anyone, including McGuffin, by describing observations of the scene where Freeman's body was discovered in a manner consistent with all other accounts of the scene, and in a manner that did not implicate McGuffin in the crime.

   2.  Defendant Schwenninger.

Plaintiffs' claim of fabrication against Schwenninger is a circumstantial fabrication claim. Plaintiffs' theory, which was adopted by the district court, is that former Coquille Police Officer David Hall disclosed nonpublic information to his stepson, Richard Bryant, about the position of Freeman's body which Bryant used in his testimony at grand jury and at the criminal trial to suggest that McGuffin had seen Freeman's body before it was found on August 3, 2000; and thus, Schwenninger fabricated evidence by eliciting Bryant's allegedly false testimony.

The district court erred because the undisputed material facts in the record blatantly contradict this theory. First, Hall and Schwenninger did not work on the case together—there was one phone call between the two.

Schwenninger's involvement with the Freeman case did not began until January 2010 (2-ER-352), more than seven years after Hall left the City of Coquille. Thus, the Plaintiffs' contention that "[i]n 2010, Defendants Schwenninger and McNeely worked with former lead case officer Hall to approach Richard Bryant" is wholly unsupported by the record.

Second, Schwenninger never approached, interviewed, or talked to Bryant, at any time, much less talked to Bryant about the conversation Bryant had with McGuffin in jail in September of 2002. Because Schwenninger had nothing to do with the testimony of Bryant and never talked to Bryant, Schwenninger could not have deliberately and knowingly "fabricate[d] evidence by eliciting Bryant's allegedly false testimony" as the district court speculated.

The record is undisputed that Oregon State Trooper John Riddle interviewed Bryant and produced a report about the conversation Bryant had with McGuffin in Jail. (3-ER-528-530) Riddle first talked to Bryant on January 25, 2010, at 11:35 AM, by telephone, when Bryant was living in John Day, Oregon. (2-ER-528) Riddle talked to Bryant two times that day, the second time being at 5:55 PM. (3-ER-528-529) Bryant and Riddle then talked for a third time by telephone on January 27, 2010, at 1:15 PM. (3-ER-530). The conversation between Hall and Schwenninger on March 2, 2010, had nothing to

do with what Bryant had already told Riddle weeks earlier, and there is no causation or connection between Schwenninger's phone call to Hall and Bryant's testimony. Thus, because Schwenninger never talked to or interviewed Bryant, Schwenninger had nothing to do with the testimony of Bryant, and Schwenninger did not cause Bryant to fabricate any conversation that Bryant had with McGuffin when they were both in jail in September of 2002, years before Schwenninger ever became involved in the investigation.

Next, the Plaintiffs' and the district court's conclusion that Bryant's testimony suggested that McGuffin "had actually seen Freeman's body and knew how it was positioned" before her body was found is not true; and the statement by the Plaintiffs and the district court that Bryant's testimony from Grand Jury to the criminal trial changed is not true. Bryant never testified that McGuffin told Bryant that McGuffin knew the location of Freeman's body and how it was positioned before it was found. Here is the testimony of Bryant:

| Criminal Trial | Grand Jury |
|---|---|
| **Direct Examination:**<br><br>By Fraiser:<br><br>A. My name is Richard Bryant, B-R-Y-A-N-T.<br>Q. Where do you currently live, sir?<br>A. John Day, Oregon.<br>Q. How long have you lived in John Day? | **Bryant Testifying:**<br><br>Well, he was telling me about Leah, and he was starting to talk about her, and I was like, you know, Well, what's going on then; how you feeling? Because, you know, when you're in jail, emotions just drain out of you. And he just started bawling, and I was like, What's going on? He |

40

A. Since 2007. (3-ER-411)

\* \* \*

Q. And during that time frame that you're together, did the Defendant talk with you about Leah Freeman?

A. It was a very short discussion, but yeah.

Q. What did he tell you?

A. He was a little emotional at the time, you know, he was crying and telling me that, you know, he can picture her laying there and her head sitting on a rock and there was nothing he could do about. And there was nothing he could do. (3-ER-414)

**Cross Examination**:

By McCrea:

Q. Mr. Bryant, you testified before the Coos County Grand Jury about this matter on August 4th of last year, didn't you?

A. Yes.

Q. And at that time what you told them Mr. McGuffin said was, "I can just — I can see her laying there. And I couldn't do anything to help her. And I can't do anything about it." Isn't that what you said?

A. Yes.　(3-ER-415)

Q. Did he tell you — yes or no did he tell you he didn't have anything to do with her disappearance?

A. Yes, he did say that. (3-ER-416)

was like, I can just -- I can see her laying there, and I couldn't do anything to help her, and I can't do anything about it.

And I'm just going, Holy crap, man. I don't want to hear about this. And -- you know, and I actually told him to shut up because I -- I really didn't want to hear about it. I didn't know if he was just going and talking and talking, or if he -- this was stuff actually coming out.

And, you know, I was basically trying to comfort him at the time because he was freaking out about being in jail and nobody was bailing him out. (3-ER-425)

And I told the jail guard about it after it happened, because he left my cell. (3-ER-426)

41

McGuffin's defense at the criminal trial did not dispute that McGuffin made the above statements to Richard Bryant. Rather, they admitted he made them and argued instead that the prosecution's characterization of the significance of the statements was incorrect. As attorney McCrea told the criminal trial judge:

> And with Richard Bryant, the State's position is that the defense may contend that these statements were not made. I doubt that we are going to take that position. However, I anticipate that Mr. Bryant's testimony, based on the Discovery, is going to be different then [*sic*] the characterization of the prosecution that Mr. McGuffin was remembering things. But rather it was — it will be our position — was musing about things. (4-ER-650-651)

Next, there is no evidence in the record that Bryant was not telling the truth. In fact, all the evidence in the record supports the fact that Bryant was telling the truth because McGuffin told other people the same thing. Bryant's testimony cannot have been prejudicial to McGuffin when other people confirmed what McGuffin told Bryant. *Tiner v. Premo*, 284 Or. App. 59, 73-74, 391 P.3d 816, *rev den*, 361 Or. 886 (2017) (where any nondisclosure of disputed evidence did not cause the petitioner to suffer prejudice, then the evidence was not material under *Brady*).

Of particular importance is what McGuffin told North Bend Police Officer Everett Young before Freeman's body was found. At the Omnibus hearing relating to the criminal trial of McGuffin, Officer Young testified that on July 5, 2000, he talked to Nick McGuffin at the Coquille Police Department:

> Uh, he did start talking about the possible current status of Leah, speculating that she might have been walking near the river and stumbled and hit her head, or on a rock or something, or fallen into the river. And that seemed like a off-the-wall, statement to me at the time, especially considering all the other potential possibilities of what could have happened to Leah — why he would come up with that one. (3-ER-443-444)

Officer Young repeated this statement by McGuffin to the jury at the criminal

trial on July 12, 2011:

> Q. After that discussion about the four a.m. phone call, did the Defendant start speculating about what could have happened to Ms. Freeman?
>
> A. He did. He started talking about how she might have been walking along the river and stumbled and hit her head on a rock and fallen into the river. It seemed kind of like a strange off the wall statement to me, especially considering all the other possibilities that could have happened. (3-ER-449-450)

Also, before the body was found, on July 4, 2000, McGuffin told Oregon State

Trooper Mark Ranger about his thought of Leah falling and hitting her head:

> McGuffin further related that he suspects that someone kidnapped Leah. He hopes that she has ran away. * * * He also added that possibly she fell down somewhere and hit her head. (3-ER-522)

Also, at the criminal trial on July 12, 2011, Dean Perske, a retired Oregon State

Police Detective, testified that on July 28, 2000 (also before Freeman's body

was found), he talked to Nick McGuffin at the Coquille Police Department:

> Q. Did you have an opportunity to ask the Defendant what he thought had happened to Ms. Freeman?
> A. Yes.

Q. What was his response?
A. One of the snares that he gave out was that she may have been walking, possibly along a river and fallen and hit her head and done that. (3-ER-436)

Detective Perske offered the same testimony at the Omnibus hearing on April 14, 2011:

Q. Did he then give you a situation, or recall an instance, where Leah had fallen, or something?
A. Yes. He then told us about an incident where —exactly that — that they had been walking along the river, and she had fallen on some rocks. I wondered how that was relevant, and asked him about it. And he thought that maybe if anything would have happened to her, it might have been that. That she may have been walking along the river, fallen and hit her head, and then fell into the water. And that's what could have happened. (3-ER-438-439)

In addition, Scott Hamilton testified at the jury trial that after Freeman's body was found, McGuffin drove Hamilton out to the site (3-ER-456):

Q. What happened when you got out of the car?
A. Nick kept looking down over the bank and talking about how, it's like he could see her laying down there by some rock or stump.

Q. Did you see anything?
A. I seen a rock or a stump down there, but other than bushes and sticks, no. (3-ER-456)

Hamilton told the Grand Jury in 2010 the same thing:

And we walked back down the road a little bit where you can look down in the ravine, and he kept talking weird about how he could see her laying down there by this rock. And he's -- this certain boulder. He just kept pointing at it, acting real weird.

* * *

44

Q. Okay. And did he say anything like wishing he could have helped her?
A. He -- yeah. He said -- he said he would -- he wished he could have helped her, and he -- he's talking about how he could -- it's like he could picture her laying there, which it really made me feel weird. (3-ER-466-467)

At the criminal trial, the attorney for Nick McGuffin, Robert McCrea,

called former Oregon State Police Officer Dale Oester as a witness. (3-ER-468)

Oester testified as follows:

Q. (by McCrea) Now, did you have another occasion to interview Scott Hamilton on September 19th of 2000?
A. (by Oester) I did.

Q. And have you reviewed your report concerning that interview?
A. I have.

Q. And you have that report in front of you?
A. Yes, sir.

Q. And did he state as follows:

> "He stated that about a week after Leah's body was found, he was going to Chris Miller's place above Fairview with Nick McGuffin. It was about 8:00 p.m. in the evening and Nick asked him if he wanted to see where Leah's body had been found. Hamilton stated that he told Nick that he didn't, but as they were driving to Fairview, Nick turned onto Lee Valley Road and drove out past the rock pit. Nick was looking to the left, driving slow, and pointed out where the grass was mashed down and said, 'That's where her body was found.'"

> "Nick drove about twenty feet past this spot and stopped the car and they got out. Nick walked back to where the grass was mashed down and he went over the bank towards the river. Hamilton said he was really not

comfortable with this and stayed up on the road and watched Nick. Nick was down at the foot of the bank looking around and touching things. Nick pointed out a spot where he said Leah had been laying. Hamilton stated he was really uncomfortable at this point, and wanted to leave."

"Nick came back up the bank and he had a picture of Leah in his hand. He was crying and looking at the picture, then walked up to him and hugged him — Hamilton. Nick was saying that he could picture Leah lying down there with her head on a rock. Hamilton stated that it really creeped him out and he started walking back toward the car.

Nick started walking with him and by the time they got the twenty feet back to the car, Nick had quit crying. They got back in the car and Nick then drove on up to Chris'."

Q. Is that what he told you?
A. Yes, it is. (3-ER-472-473)

Considering all the testimony about what McGuffin told people other than Bryant about Leah falling and hitting her head on a rock while by a river, and the fact that McGuffin never denied making the statements to Bryant, Ranger, Young, Hamilton, and Perske, the only inference is that the Bryant's statements were true. Thus, there is not a reasonable likelihood that without the use of Bryant's testimony McGuffin would not have been convicted. As stated by the 3rd Circuit in *Halsey v. Pfeiffer:*

Thus, a civil plaintiff alleging that he had been convicted in a criminal prosecution in which the prosecutor used fabricated evidence should not be permitted to survive a motion for summary

46

judgment or for judgment as a matter of law unless he can demonstrate that the record supports a conclusion that the allegedly fabricated evidence was so significant that it could have affected the outcome of the criminal case. Moreover, testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong. Therefore, for example, a witness's misidentification should not be regarded as a fabrication in the absence of persuasive evidence supporting a conclusion that the proponents of the evidence were aware that the identification was incorrect, and thus, in effect, offered the evidence in bad faith. Accordingly, we expect that it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case.

750 F.3d 273, 295 (3rd Cir. 2014).

Further, the district court pointed to no evidence in the record as to what so-called "nonpublic information" Hall allegedly disclosed to Bryant. The district court simply guessed that Hall told Bryant about the position of Leah's body. Guesswork is not admissible. Finally, the location of the body was in the newspapers, as evidenced by the District Attorney's press release dated August 3, 2000:

> "The body was located approximately 10 to 15 feet from Lee Valley Road down a steep embankment. The area is BLM forestland. The location was approximately 1.5 miles from the junction of Lee Valley Road with Fairview Route." (3-ER-533)

By the time Bryant and McGuffin spoke in September 2002, McGuffin had walked the site and went down the embankment. (3-ER-466) There was no "nonpublic information" Hall could have told Bryant to support the theory that

Bryant's testimony was fabricated, let alone at the direction of Schwenninger.

Thus, Schwenninger is entitled to summary judgment on this count.

### C. Defendants are Entitled to Qualified Immunity on Plaintiff McGuffin's Fourth and Fourteenth Amendment Claims (Counts 2 & 3).

The Plaintiffs contend that the Defendants on appeal are liable to McGuffin for malicious prosecution and illegal pretrial detention. These claims both arise under the same constitutional framework of the Fourth Amendment. *See Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 562 (2024); *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 367 (2017). The district court stated that both counts require Plaintiffs to prove that the "Municipal Defendants" caused the initiation of grand jury proceedings against McGuffin without probable cause. (1-ER-38) This is error for a significant reason. Under *Cunningham* and *Gates*, the district court was required to find that the specific conduct each individual defendant prove that each, individually, initiated a prosecution maliciously against McGuffin and without probable cause. The district court did not engage in this required analysis as to Karcher, Oswald, Schwenninger, and Zanni therefore, each is entitled to a dismissal of Counts two and three since it was the Plaintiffs' burden of proof, not Defendants, to show that both prongs of qualified immunity went against each Defendant on appeal.

To illustrate this point, the district court denied Defendants on appeal qualified immunity "because there is evidence from which a jury could find that

the Municipal Defendants [most of whom are no longer parties] improperly influenced the District Attorney in his decision to initiate the proceedings." (1-ER-39) The district court then points to conduct of other defendants, who are no longer parties to this lawsuit, about their involvement with witness Lindegren. (1-ER-40) These findings have nothing to do with any conduct of Karcher, Oswald, Schwenninger, or Zanni.

Specifically, the only factual finding by the district court about the conduct of Oswald concerns his conduct in July of 2000. He had ceased any involvement with the Freeman case years before any prosecution was ever initiated by the Grand Jury. No reasonable jury could find Oswald responsible for maliciously initiating a prosecution of McGuffin without probable cause a decade later.

As to Zanni, he authored a report of an interview he conducted on September 21, 2000. Plaintiffs contend that this report was withheld from the defense in the criminal case. However, Plaintiffs do not allege it was withheld by Zanni. Rather, Plaintiffs contend that it was in the possession of other Defendants no longer parties to this lawsuit years later and then suppressed by those other Defendants. (1-ER-31) Thus, regardless of the facts, material or otherwise, there is no basis to find that Zanni maliciously initiated criminal

49

proceedings without probable cause against McGuffin in 2010, after he had retired from the Coos County Sheriff's Office.

The district court also concluded that there were issues of fact as to the existence of probable cause because "Municipal Defendants fabricated police reports, manipulated witnesses, and withheld, suppressed, or destroyed evidence" (1-ER-41), and the "Municipal Defendants acted with malice in their reckless disregard to McGuffin's rights and to the truth." (1-ER-41) As discussed elsewhere herein, the conclusions drawn by the district court as to Karcher's and Schwenninger's alleged misconduct were clear error, and the conduct of other Defendants no longer parties to this lawsuit are not binding upon the Defendants on appeal and cannot be imputed to the Defendants on appeal. Therefore, Karcher and Schwenninger are entitled to summary judgment on this count as well. *Stephenson v. California*, *supra*; ("When considering whether qualified immunity applies to members of a group, the actions of each must be considered separately); *Cunningham v. Gates*, 229 F.3d 1271, 1282 (9th Cir. 2000), *as amended* (Oct. 31, 2000) ("The district court never conducted an individualized analysis to determine whether each moving defendant was entitled to qualified immunity based on his or her individual actions.")

50

In addition, the district court acknowledged that in moving to dismiss the charges against McGuffin District Attorney Frasier noted that there was evidence from which a jury could still find McGuffin guilty. (1-ER-57) This is consistent with the post-conviction judge's determination in rejecting McGuffin's claim for actual innocence (2-ER-132), and wholly inconsistent with a finding of lack of probable cause.

Karcher is also entitled to qualified immunity under the second prong of the immunity inquiry because the law was not clearly established that she can be held liable for her conduct in this case, *i.e.*, testifying as to her observations of the scene where Freeman's body was recovered in a manner that was not malicious and did not implicate anyone, including McGuffin, thus had no effect on the Grand Jury's determination that there was probable cause to initiate criminal proceedings against McGuffin.

As to Schwenninger, he is likewise entitled to qualified immunity on the second immunity prong because the law was not clearly established that he can be held liable for fabricating evidence of the testimony of a witness (Bryant) when he never spoke to the witness (Bryant), when there was no evidence of what was told to the witness (Bryant), and when the testimony of the witness was true.

**D. Defendants are Entitled to Qualified Immunity on Plaintiffs' Fourteenth Amendment Due Process claim (Count 4).**

The district court made no factual findings supporting Count Four against Karcher or Oswald for failing to disclose exculpatory evidence to Paul Frasier. Instead, the district court enumerated several circumstances of "clearly established law" at a high level of generality and found that the Municipal Defendants as a group were on notice of and violated their obligations to disclose exculpatory evidence. (1-ER-53) This was clear error entitling Karcher and Oswald to qualified immunity since Plaintiffs failed to sustain their burden of proof.

Further, the only factual finding relevant to Zanni involved his report of his interview of David Jenkins in September of 2000. However, as discussed *supra*, even if this report was suppressed, it was not suppressed by Zanni. Even assuming Frasier did not receive the report of the interview with Jenkins, that does not support suppression by Zanni.

As to Schwenninger, the district court assumed that he had Zanni's report referencing that Bryant heard something from Hall in 2000. There is no evidence that Schwenninger had or knew about that report. The district court also concluded that it is significant that one of the Defendants (unnamed) withheld from the District Attorney that Bryant was Hall's stepson and may have heard things from Hall. What someone may have heard is not evidence

and is not a fact; rather, it is pure speculation as to what was heard. What was actually said between Hall and Byant would be a fact, but that fact is not in evidence in this case. There is no evidence in the record of what was said between Hall and Bryant. All we know is that Hall was in Black Butte working as a police officer—not working on the Freeman case—when Bryant and McGuffin were in jail together in September of 2002. We also know that Bryant immediately reported the conversation he had with McGuffin to the jail guard after it occurred. (3-ER-426)

Finally, because this is no evidence of what was said between Hall and Bryant, Plaintiffs failed to show that had the evidence been disclosed to McGuffin and used at trial, there was a "reasonable probability" that the jury would have found McGuffin innocent. That is, Plaintiffs cannot show materiality under *Brady*. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) ("there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.") The Plaintiffs' argument "based on imagined uses of the" evidence "do not meet *Brady*'s reasonable probability standard." *Williams v. MCI-Shirley Medium Superintendent*, 2025 WL 2823322, at 5 (D. Mass. Oct 3, 2025).

53

In addition, despite Frasier's claim that Frasier did not know Bryant was Hall's stepson, and despite McGuffin's claim that his attorneys did not know Bryant was Hall's stepson, that exact information is in the police report of Lieutenant Bud Young dated July 5, 2000, which was provided to both Frasier and the attorneys for McGuffin: "Kathleen said that Richard Bryant (step son of Coquille Officer David Hall) saw Nick at the . . ."]  (3-ER-628) Thus, it is undisputed that Frasier and McGuffin's attorneys had the information in their possession, and there was no need for someone else to again provide Frasier and McGuffin's attorneys the same information a second time. *Brady* does not require the same information be provided the prosecutor and defense more than one time. Because no exculpatory evidence was withheld by Schwenninger and not provided to Frasier, Schwenninger is entitled to qualified immunity on either prong of the immunity analysis.

**E. Defendants are Entitled to Qualified Immunity on Plaintiff McGuffin's Fourteenth Amendment Due Process Claim (Count 5).**

Plaintiffs contend that the Defendants are liable to McGuffin for failing to intervene in the actions of others to prevent violation of McGuffin's constitutional rights. The law the district court relied on in its analysis of this claim is as follows:

> "[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir.

54

2000), *as amended* (Oct. 31, 2000) (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir.1994), *rev'd on other grounds*, 518 U.S. 81, 116 (1996)).

The district court denied Defendants' summary judgment on this claim:

> "[B]ecause the Original Investigation took place over many months and the Cold Case Investigation took place over several years, there is evidence in the record from which a jury could conclude that each Municipal Defendant was aware of the suppression and fabrication of evidence in violation of McGuffin's constitutional rights and realistically "had an opportunity to intercede." 229 F.3d 1271, 1289–90 (9th Cir. 2000), as amended (Oct. 31, 2000) (internal quotation marks omitted)."

(1-ER-44-45) The district court did not conduct the individualized analysis required by *Cunningham*. It did not cite one fact from any evidence in the record showing where Karcher, Oswald, Schwenninger, or Zanni knew of any unconstitutional conduct of any police officer and there is not one citation to one fact to show where Karcher, Oswald, Schwenninger, or Zanni had an opportunity intervene, much less a fact showing they were required to intervene. Rather, the district court improperly lumped all the Municipal Defendants together, many of whom never worked on the Freeman case together or at the same time, and some of which had retired by the time the case was prosecuted.

As to Oswald, the district court's reasoning is particularly inapt. Oswald's only relevant involvement in the investigation was in 2000. He did not have any meaningful participation in the "the Original Investigation [that]

55

took place over many months" and did not participate at all in the " Cold Case

Investigation [that] took place over several years" such that a jury could

conclude that he was "aware of the suppression and fabrication of evidence in

violation of McGuffin's constitutional rights and realistically 'had an

opportunity to intercede.'" Oswald had retired and left the Coos County

Sheriff's Office by 2006. This is a glaring example of why an individualized

analysis is required for each individual defendant to properly assess entitlement

to qualified immunity. The same is true of Zanni; that is, how could Zanni be

required to intervene in the acts of police officers after he retired?

In addition, as to Karcher, the clearly established law the district court

relied upon in denying qualified immunity applies only to police officers. *See*

*Cunningham*, *supra.* The district court did not find, and the Plaintiffs did not

allege, that Karcher was a police officer. She is a forensic nurse and the Chief

Deputy Medical Examiner for Coos County. Therefore, Karcher is entitled to

qualified immunity under the second prong, because the law was not clearly

established that a medical examiner can be held liable for failing to intervene to

prevent a violation of constitutional rights by a police officer, even where such

a violation may occur. *See Musso v. Hourigan*, 836 F.2d 736, 743 (2d Cir.

1988) ["[T]here is no Supreme Court or Second Circuit authority that imposes

56

an affirmative duty on a non-police state actor ... to intervene to prevent a police officer from conducting an unlawful search and seizure.").

### F. Defendants are Entitled to Qualified Immunity on Plaintiff McGuffin's Fourteenth Amendment Due Process Claim (Count 6).

The district court found that "Plaintiffs provide[d] evidence from which a jury could find that the Municipal Defendants had an agreement to conspire against McGuffin." (1-ER-43) The district court then again points to conduct by other Defendants no longer parties to support its findings. (1-ER-44) No factual findings were made to support the contention that Karcher, Oswald, Schwenninger, or Zanni agreed to conspire against McGuffin as required by *Stephenson*, *supra*. This is insufficient. *See Lyman v. County of Geary*:

> Rather, Plaintiffs make broad and conclusory statements such as "Defendants, including Odell, Frazier, and Mitchell, suppressed Mitchell's report" and "Defendants withheld all of the above-described information purposefully." These "'[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim.'"

2025 WL 2855388, 13 (D. Kan. Oct 8, 2025).

### G. Defendants are Entitled to Qualified Immunity on Plaintiff McGuffin's Fourteenth Amendment Due Process Claim (Count 7).

No factual findings to support this Count were made as to Defendants Schwenninger or Zanni; thus, they are entitled to immunity.

57

Plaintiffs' destruction of evidence claim against Karcher is based upon the loss of the video tape taken by Lt. Pex at the scene where Freeman's body was found. The record relevant to the video tape is, as detailed *supra*:

- On January 14, 2001, the FSS Lab in England requested physical evidence and photos and videos of the scene. (2-ER-309)
- Karcher checked the video tape out of Coquille PD evidence on March 22, 2001. (2-ER-346)
- The *same day*, Karcher had arrived in England and attended a case conference with FSS forensic scientists at the Chorley laboratory. (2-ER-296)
- There is no further evidence of what happened to the video, but all other items (shoes and clothes) requested by the lab were delivered and the lab never indicated that the video had not been delivered.
- There is no evidence in the record that anyone, including Karcher, had viewed the tape.
- There is no evidence to suggest that anything on the tape was of exculpatory value to McGuffin.

Plaintiffs aver that Karcher checked out the video tape, and instead of delivering it to the lab in England as requested, destroyed it, yet did deliver the other requested materials. Plaintiffs contend that Karcher had reason to know the video contained something exculpatory, so the destruction was done with malice toward McGuffin.

It is undisputed that Plaintiffs have no actual evidence that the tape included anything of exculpatory value to McGuffin. Plaintiffs are unable to demonstrate Karcher's knowledge of some apparent exculpatory value of the

58

evidence to support a finding of bad faith. *See U.S. v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013). It is pure speculation that the video would show anything that is not documented in the extensive reports, photos, and testimonial accounts of the scene. The adoption by the district court of Plaintiffs' version of events required blind deference to the Plaintiffs' concocted theory in the face of a blatantly contradictory record.

Karcher is entitled to qualified immunity under the first or second prong of the immunity inquiry, because drawing only reasonable inferences in Plaintiffs' favor, the very most that can be shown is that Karcher negligently or inadvertently lost the video tape. Negligent conduct does not violate the Constitution, particularly where it occurs prior to any prosecution being initiated, and prior any obligation to disclose exculpatory evidence.

Oswald is entitled to immunity because the basis of this Count is his alleged failure to collect or preserve evidence in the area where he found Freeman's left shoe. The district court adopted the opinion of Plaintiffs' expert that items collected in proximity to the shoe would have been key evidence, and that Oswald allegedly collected such items and failed to turn them in. The first problem with this is that the record shows Oswald did collect and turn in other items found near the left shoe. There is no evidence that any items were collected and not turned in, let alone any evidence to suggest the items were

59

exculpatory. There is no clearly established law that an officer can be held liable for failing to preserve items of no known evidentiary value years before any criminal prosecution is initiated.

## CONCLUSION

For the foregoing reasons, the trial court's determinations that Defendants Karcher, Schwenninger, Oswald, and Zanni are not entitled to qualified immunity should be reversed.

Respectfully submitted,

/s/ Sarah R. Henderson
FRANZ & HENDERSON
Sarah R. Henderson        OSB #153474
Of Attorneys for Defendants-Appellants

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
　　☐ it is a joint brief submitted by separately represented parties.
　　☐ a party or parties are filing a single brief in response to multiple briefs.
　　☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated                     .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                                   **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                              *Rev. 12/01/22*

## CERTIFICATE OF RELATED CASES

I certify that the four cases for which this Consolidated Opening Brief is filed (25-2548 McGuffin v. Karcher et al., 25-2558 McGuffin v. Oswald et al., 25-2565 McGuffin v. Schwenninger, et al., and 25-2575 McGuffin v. Zanni, et al.) are the only related cases presently pending in the Ninth Circuit Court of Appeals.

DATED:  Sunday, October 19, 2025.


/s/ Sarah R. Henderson
Sarah R. Henderson        OSB #153474
P.O. Box 62
Springfield, Oregon 97477
E-Mail:  shenderson@franzlaw.comcastbiz.net
Telephone: (541) 741-8220
 Of Attorneys for Defendants-Appellants