Nos. 25-2548, 25-2558, 25-2565, and 25-2575

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NICHOLAS JAMES MCGUFFIN,
as an individual and as a guardian ad litem,
on behalf of S.M., a minor and S.M.,

*Plaintiff-Appellees*,

*v.*

KRIS KARCHER, KIP OSWALD,
ERIC SCHWENNINGER, and CRAIG ZANNI,

*Defendants-Appellants.*

Appeal from the United States District Court
for the District of Oregon (Eugene)
Case Nos. 6:20-cv-1163-MTK; 3:21-cv-1719-MTK

## ANSWERING BRIEF OF PLAINTIFFS-APPELLEES

Janis C. Puracal, OSB #132288
Andrew C. Lauersdorf, OSB #980739
Maloney Lauersdorf Reiner PC
1111 E. Burnside Street
Ste. 300
Portland, Oregon 97214
Telephone: (503) 245-1518
Facsimile: (503) 245-1417

David B. Owens
Loevy & Loevy
c/o Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
P.O. Box 85110
Seattle, WA 98145-1110
(312) 243-5900
(312) 243-5902

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... v

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 4

ISSUES PRESENTED ....................................................................... 5

STATEMENT OF THE CASE ............................................................. 6

   I.   Facts Underlying Plaintiff's Claims ............................................... 6

      A.   Leah Freeman Disappears in 2000; McGuffin Spends All Night Searching For Her .......................................................... 6

      B.   Despite Evidence of His Innocence, McGuffin Is Targeted as a Suspect During the Initial Investigation ................................. 8

      C.   The HIT Team Continues To Pursue McGuffin, And Suppressed Evidence ................................................................ 11

      D.   The Cold Case Investigators Reopen The Case and Fabricate A False Case Against McGuffin to Charge Him With Freeman's Death .................................................................... 13

      E.   McGuffin is Subject to Bogus Criminal Proceedings, Wrongfully Convicted, and then Exonerated ......................... 15

      F.   Plaintiffs' File This Suit and The Trial Court Finds A Reasonable Jury Can Find Each Municipal Defendant Violated Plaintiffs' Rights ................................................... 16

SUMMARY OF THE ARGUMENT ..................................................... 21

ARGUMENT .................................................................................... 24

   I.   This Appeal Should Be Dismissed Because Defendants' Arguments Exceed This Court's Limited Jurisdiction ................. 24

      A.   Appellate Jurisdiction Over Interlocutory Appeals Is Narrow and Strictly Conscribed ..................................................... 24

B.    Defendants' Impermissible Fact-Based Challenges Exceed Appellate Jurisdiction, Requiring Dismissal ..........................26

C.    Though Framed As Arguments About Qualified Immunity, Defendants' Arguments Are Actually Challenges About the Facts To Be Proved At Trial ...................................................30

D.    Defendants Cannot Challenge the District Court's Factual Findings Writ Large By Claiming They Are Blatantly Contradicted By the Record....................................................33

II.   Even Assuming Jurisdiction, Plaintiffs' Claims Involve Clearly Established Constitutional Rights ................................................39

A.    It Was Clearly Established By 2000 that Officials Could Not Fabricate Evidence ...............................................................41

B.    It Was Clearly Established by 2000 Officials Have An Obligation to Disclose Favorable Information ........................43

C.    It Was Clearly Established in 2000 Officials Cannot Destroy Evidence With Apparent Exculpatory Value ...........................45

D.    It Was Clearly Established In 2000 That Investigators Cannot Prosecute Someone In the Absence of Probable Cause ..........45

E.    It was Clearly Established in 2000 That Officials  Cannot Conspire to Violate Someone's Rights.....................................47

F.    It Was Clearly Established By 2000 Officials Have A Duty To Intervene To Prevent The Violation of Constitutional Rights When they Have The Opportunity to Do So ..........................49

G.    It Was Clearly Established in 2000 That Officers Cannot Wrongfully Deprive a Child of Their Liberty Interest in the Companionship of the Parent ................................................51

III.  The Trial Court's Individualized Findings Are Amply Supported by the Record ..............................................................................55

iii

A.  The Trial Court Correctly Found that There Is Evidence From Which a Reasonable Jury Could Conclude that Karcher Violated McGuffin's Constitutional Rights ............................. 56

B.  The Trial Court Correctly Found that There Is Evidence From Which a Reasonable Jury Could Conclude that Zanni Violated McGuffin's Constitutional Rights ........................................... 60

C.  The Trial Court Correctly Found that There Is Evidence From Which a Reasonable Jury Could Conclude that Oswald Violated McGuffin's Constitutional Rights ............................. 61

D.  The Trial Court Correctly Found that There Is Evidence From Which a Reasonable Jury Could Conclude that Schwenninger Violated McGuffin's Constitutional Rights ............................. 64

E.  Defendants' Fabrications Harmed McGuffin .......................... 67

F.  Defendants' Suppressions Harmed McGuffin ........................ 70

CONCLUSION .................................................................................. 71

iv

# TABLE OF AUTHORITIES

Cases

*Adams v. Speers*, 473 F.3d 989 (9th Cir. 2007) ..................................6, 26

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ......................6

*Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333 (1988)..............33, 45

*Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. 2004) .............46, 47

*Baker v. Roman Catholic Archdiocese of San Diego*, 725 F. App'x 531
 (9th Cir. 2018).........................................................................................66

*Barlow v. Ground*, 943 F.2d 1132 (9th Cir. 1991)..................................46

*Brady v. Maryland*, 373 U.S. 83 (1963)...........................................43, 70

*Branch v. Tunnell*, 937 F.2d 1382 (9th Cir. 1991) .................................23

*Brosseau v. Haugen*, 543 U.S. 194 (2004)..............................................40

*Caldwell v. City & Cnty. of San Francisco*, 899 F.3d 1105
 (9th Cir. 2018).................................................................................42, 67

*California v. Trombetta*, 467 U.S. 479 (1984) ........................................33

*Carillo v. County of Los Angeles*, 798 F.2d 1210 (9th Cir. 2015)............44

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................41

*Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024).............................45

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483
 (9th Cir. 2010).........................................................................................48

*Chuman v. Wright*, 960 F.2d 104 (9th Cir. 1992)...................................3

*Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945
 (9th Cir. 2010) .................................................................................42, 52

*Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090
(9th Cir. 2005) ........................................................... 32, 66

*Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023) ........................................... 4

*Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101
(9th Cir. 2010) ........................................................... 42, 58

*Cunningham v. Gates*, 229 F.3d 1271 (9th Cir. 2000) ...................... 41, 49

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) .................... 23, 42, 67

*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009) ..................................... 2, 25

*Est. of Anderson v. Marsh*, 985 F.3d 726 (9th Cir. 2021) ...... 21, 24, 25, 55

*Fatai v. Ramos*, No. 23-15354, 2024 WL 863360
(9th Cir. Feb. 29, 2024) .................................................. 26

*Foster v. City of Indio*, 908 F.3d 1204 (9th Cir. 2018) ................ 21, 24, 25

*Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) ...... 47

*George v. Morris*, 736 F.3d 829 (9th Cir. 2013) ...................................... 26

*Giglio v. United States*, 405 U.S. 150 (1972) .................................... 44, 70

*Grisby v. Blodgett*, 130 F.3d 365 (9th Cir. 1997) .................................... 23

*Halsey v. Pfeiffer*, 750 F.3d 273 (3r. Cir. 2014) ...................................... 69

*Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997) ........................... 46, 47

*Hernandez v. San Jose*, 897 F.3d 1125 (9th Cir. 2018) ...................... 25, 39

*Hernandez v. Town of Gilbert*, 989 F.3d 739 (9th Cir. 2021) ................. 34

*Holley v. Techtronic Indus. N. Am.,* 812 F. App'x 517
(9th Cir. 2020) ................................................................. 32

*Hope v. Pelzer*, 536 U.S. 730 (2002) ....................................................... 40

*Hughes v. Rodriguez*, 31 F.4th 1211 (9th Cir. 2022) .............................. 35

*Jensen v. United States*, 326 F.2d 891 (9th Cir. 1964)............................36

*Johnson v. Jones*, 515 U.S. 304 (1995) .........................................2, 21, 24

*Kyles v. Whitney*, 514 U.S. 419 (1995) ................................. 43, 44, 70, 71

*Lacey v. Maricopa County,* 693 F.3d 896 (9th Cir. 2012) ......................41

*Lemire v. California Dep't. of Corr. & Rehab*, 726 F.3d 1072
    (9th Cir. 2013)...............................................................................52, 54

*Liston v. Cnty. of Riverside*, 120 F.3d 965 (9th Cir. 1997),
    *as amended* (Oct. 9, 1997) .......................................................23, 63

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) .....................................................54

*Maldonado v. Morales*, 556 F.3d 1037 (9th Cir. 2009) ..........................48

*Manuel v. City of Joliet,* 580 U.S. 357 (2017) ..................................45, 47

*McDonough v. Smith*, 588 U.S. 109 (2019)............................................46

*Melendres v. Maricopa Cnty.*, 815 F.3d 645 (9th Cir. 2016)..................24

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) ..........................43, 44, 62

*Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283
    (9th Cir. 1999)...................................................................................47

*Meyer v. Nebraska*, 262 U.S. 390 (1923).................................................53

*Mooney v. Holohan*, 294 U.S. 103 (1935)...............................................41

*Musso v. Hourigan*, 836 F.2d 736 (2d Cir. 1988)...................................50

*Napue v. Illinois*, 360 U.S. 264 (1959) ...................................................41

*Olivier v. Baca*, 913 F.3d 852 (9th Cir. 2019).........................................41

*Orr v. Plumb*, 884 F.3d 923 (9th Cir. 2018)............................................34

*Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142
    (9th Cir. 2013).....................................................................................69

*Peck v. Montoya*, 51 F.4th 877 (9th Cir. 2022) .................................. 22, 25

*Phoenix v. Reddish*, 175 F. Supp. 2d 215 (D. Conn. 2001) ..................... 50

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ........................................ 54

*Pyle v. Kansas*, 317 U.S. 213 (1942) ..................................................... 42

*Ramos v. Louisiana*, 590 U.S. 83 (2020) ............................................... 15

*Richards v. County of San Bernadino*, 39 F.4th 562
  (9th Cir. 2022) ........................................................................ 42, 68, 69

*Sanchez v. City of Hawthorne*, 644 F. App'x 756
  (9th Cir. 2016) ...................................................................................... 35

*Scott v. Harris*, 550 U.S. 372 (2007) ................................. 3, 17, 22, 33, 34

*Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir. 1987) ................. 51, 52

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) ......................... 54, 58, 63

*Taylor v. Riojas*, 141 S. Ct. 52 (2020) ............................................... 40, 51

*Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078
  (9th Cir. 2009) ........................................................................................ 6

*Thomas v. Computax Corp.*, 631 F.2d 139 (9th Cir. 1980) ..................... 36

*Thompson v. Clark*, 596 U.S. 36 (2022) ............................................ 45, 46

*Tolan v. Cotton*, 572 U.S. 650 (2014) ............................................. 2, 39, 40

*United States v. Agurs*, 427 U.S. 97 (1976) ...................................... 70, 71

*United States v. Butler*, 567 F.2d 885 (9th Cir. 1978) ........................... 44

*United States v. Koon*, 34 F.3d 1416 (9th Cir. 1994) ........................ 41, 49

*United States v. Patterson*, 230 F.3d 1168 (9th Cir. 2000) .................... 37

*Ward v. EEOC*, 719 F.2d 311 (9th Cir. 1983) ........................................ 48

*Washington v. Glucksberg*, 521 US 702 (1997) ................................ 51, 53

viii

*Watson v. Button*, 235 F.2d 235 (9th Cir. 1956) ...................................... 36

*Wearry v. Cain*, 136 S. Ct. 1002 (2016)..................................................... 70

*White v. Pauly*, 580 U.S. 73 (2017) .......................................................... 40

*White v. Roper*, 901 F.2d 1501 (9th Cir. 1990) ......................................... 69

*Ziglar v. Abbasi*, 582 U.S. 120 (2017) ...................................................... 40

Statutes

28 U.S.C. § 1291.......................................................................................... 24

28 U.S.C. § 1331........................................................................................... 4

28 U.S.C. § 1367(a) ....................................................................................... 4

42 U.S.C. § 1983........................................................................................... 1

Rules

FED. R. APP. P. 4(a)(2) .................................................................................. 4

FED. R. APP. P. 10(b)(2) .............................................................................. 36

Other Authorities

NINTH CIR. JUR. INST. § 9.33........................................................................ 67

ix

**INTRODUCTION**

Nicholas McGuffin was wrongfully convicted of killing his girlfriend, Leah Freeman, in rural Oregon. McGuffin was wrongfully imprisoned for nearly a decade before the conviction was vacated and the charges dismissed. McGuffin's factual innocence has now been certified by an Oregon state-court judgment.[1]

In this action, under 42 U.S.C. § 1983, McGuffin seeks redress for violations of his constitutional rights that caused his wrongful conviction. McGuffin's minor daughter, S.M., is also a plaintiff, and brings claims related to her loss of familial relationship with her father.

Defendants to this suit included officials from the State of Oregon; Richard Walter and the Vidocq Society; and officials from two cities, one county, and their respective municipal entities, collectively called "Municipal Defendants." After summary judgment was briefed but undecided, all but the Municipal Defendants reached settlements with Plaintiffs. The trial court issued its decision overwhelmingly denying the Municipal Defendants' motions. 1-ER. Then, the bulk of the

---

[1] Plaintiffs ask this Court to take judicial notice of this fact. *See* Dkt. 44.

1

Municipal Defendants settled their claims, leaving four officials and Coos County as defendants in the case, 1-SER-52-53.

The trial court found a reasonable jury can find the four remaining individuals—Oswald, Zanni, Schwenninger, and Karcher— each took steps individually and as part of a conspiracy, *e.g.*, 1-ER-29, 31, 35, 39, 41, in violation of Plaintiffs' rights. In this interlocutory appeal, Defendants criticize the trial court for "adopt[ing] Plaintiffs' version of events," Opening Brief (OB) 58, even though doing so is mandatory for summary judgment. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Defendants attack directly the trial court's findings of fact.

This Court lacks jurisdiction over this appeal. An official may not immediately appeal "a *fact*-related dispute about the pretrial record, namely, whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 307 (1995). A "district court's determination that the parties' evidence presents genuine issues of material fact is categorically unreviewable on interlocutory appeal." *Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009). Nor may an interlocutory appeal

advance arguments not made—and thus forfeited—below. *Chuman v. Wright*, 960 F.2d 104, 105 (9th Cir. 1992).

In an effort to circumvent these rules, Defendants assert the trial court's findings are "blatantly contradicted" by the record, and that *Scott v. Harris*, 550 U.S. 372 (2007), somehow permits this Court to ignore the district court's factual findings. OB9. That argument was forfeited below and again on appeal. But, it is also meritless, as Defendants offer no objective, irrefutable evidence contradicting any of Plaintiffs' assertions or evidence in the full summary-judgment record.[2]

There is no reasonable dispute that in 2000, when Ms. Freeman was killed and the investigation of McGuffin began, it was clearly established that officials could not fabricate evidence or premise probable cause on such evidence. It was also clearly established hat officials had an obligation to disclose favorable evidence, and that law enforcement cannot destroy evidence when its value is apparent. Because there is no reasonable dispute these constitutional violations

---

[2] Tellingly, Defendants refused to provide the full summary-judgment record from below, even as pertains to their own motion. What Defendants call the "record before this Court" OB9, 17, 36, is egregiously incomplete and self-serving.

were already clearly established, Defendants have elected to present an interlocutory appeal that brazenly challenges the trial court's factual findings without even providing this Court the record the trial court actually relied on in making those findings. Defendants' acts are forbidden, and this appeal is an abuse of the judicial process. As such, the appeal should be dismissed as one of this Court's "robust tools to prevent unwarranted delay and deter frivolous interlocutory appeals." *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 745 (2023).

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 and 1367(a). On July 2, 2025, the district court denied Defendants' motion for summary judgment. 1ER2-63. Though the notices of appeal were premature, Plaintiffs do not contest timeliness now. *See* FED. R. APP. P. 4(a)(2). As explained below, this Court lacks jurisdiction over this appeal for other reasons.

4

## ISSUES PRESENTED

1.     Whether Defendants' fact-based or forfeited arguments that contest the district court's findings deprive this Court of jurisdiction such that the appeal should be dismissed.

2.     Whether, assuming *arguendo* this Court could exercise jurisdiction over Defendants' arguments, Defendants had notice they could not fabricate evidence, suppress material information to cause McGuffin's wrongful conviction, and deprive Plaintiffs of their familial relationships.

## STATEMENT OF THE CASE

The facts are from the findings made by the district court and as further supported by Plaintiffs' evidence presented in Supplemental Excerpts of Record (SER), and must be accepted as true and cannot be contested at this juncture. *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1081 (9th Cir. 2009); *Adams v. Speers*, 473 F.3d 989, 990-91 (9th Cir. 2007). A trial court's finding that disputes of fact are "genuine" indicates "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### I. Facts Underlying Plaintiff's Claims

The district court made findings (further supported by additional evidence Plaintiffs provided as noted) as follows:

### A. Leah Freeman Disappears in 2000; McGuffin Spends All Night Searching For Her

Plaintiff Nicholas McGuffin grew up in Coquille, Oregon, and attended Coquille High School, where he and Leah Freeman met and began dating in 1999. 1-ER-3.

Around 7:00 p.m. on June 28, 2000, McGuffin dropped off Freeman at her friend Cherie Mitchell's house and never saw or spoke

with her again. 1-ER-3-4. McGuffin was set to pick up Freeman around 9:00 p.m., 1-ER-4, but Freeman was already gone by the time he arrived around 9:08. *Id.* Freeman had argued with her friend, Cherie Mitchell, and left Mitchell's home on foot sometime before 9:00 p.m. 1-ER-4.

After learning that she had left on foot, McGuffin began searching for Freeman. 1-ER-4. Sometime between 9:15 p.m. and 9:30 p.m., Freeman was seen standing by herself across the street from the high school, between the cemetery and the gas station. 1-ER-4. As for McGuffin, between 9:00 and 10:00 p.m., seven individuals—including Freeman's own family and friends—saw or interacted with McGuffin during his search. 1-ER-4 n.1.[3]

McGuffin spent the majority of that night and into the early morning searching for Freeman, including making trips to Freeman's home and speaking with her mother by phone. 1-ER-5.

---

[3] Plaintiff's additional evidence, cited by the district court here, details eight instances of people interacting with McGuffin as he looked for Freeman between 9:00 and 10:00 p.m.: Freeman's older sister saw McGuffin twice when he went to her workplace, Denny's Pizza, while Brent Mauro, Quinn Cannon, Amanda Landmark, Lyndee Kindred, Mike McAdams, and Haley Greenway separately also saw McGuffin.

7

McGuffin was driving his blue Mustang that evening. 1-ER-3-4. The Mustang had a gas leak, limiting its range and so McGuffin asked Kristen Steinhoff, a friend, to help him search for Feeman, which they did in Steinhoff's mother's boyfriend's purple Kia. 1-ER-5. When they did not find Freeman, Steinhoff returned home, and McGuffin returned to his blue Mustang. *Id.*

McGuffin's parents had a red Thunderbird, but McGuffin did not drive that car at all that evening when searching for Freeman. 1-ER-18.

McGuffin ended his search for Freeman that evening when he drove past her home and saw a light on in Freeman's bedroom, leading McGuffin to believe she had returned. 1-ER-5. McGuffin drove home, arriving around 2:30 a.m. *Id.*

### B. Despite Evidence of His Innocence, McGuffin Is Targeted as a Suspect During the Initial Investigation

McGuffin was mistaken; Freeman had not returned. McGuffin and Freeman's mother reported disappearance to the Coquille Police Department ("CPD") in the morning. *Id.* The police thought Freeman had runaway and did not pursue the case as a violent crime. *Id.*

The case eventually became a homicide investigation. 1-ER-6.

8

The original investigation was conducted by Officers Reaves, Hall, McInnes, and Zavala of CPD; Defendants Oswald and Zanni, plus Officer Downing of the Coos County Sheriff's Office ("CCSO"); Defendant Karcher of the Coos County Medical Examiner; and others.[4] 1-ER-6.

Officer Hall was appointed to lead the original investigation despite never having worked on a major crime investigation or murder case and who, by his own admission, lacked necessary training to lead the investigation. 1-ER-6.

The night Freeman was abducted, a passerby found her *right* shoe in the road next to the town cemetery. 1ER-6. The right (cemetery) shoe did *not* have any bloodstains on it. 6-SER-1514.

Defendant Oswald, a Coos County Sheriff's Deputy at the time, later produced Freeman's left shoe, which he claimed to find about a

---

[4] Several individuals and entities involved in the investigation have reached a settlement and been dismissed from this suit. Those parties are "State Defendants" (Oregon State Police, Susan Hormann, Mary Krings, John Riddle, and Kathy Wilcox); "Coquille Defendants" (City of Coquille, Mark Dannels, Raymond McNeely, Michael Reaves, Sean Sanborn, Chris Webley, David Zavala, and Joel D. Shapiro as Administrator of the Estate of David E. Hall); and "Vidocq Defendants" (Vidocq Society and Richard Walter). 1-SER-10-54.

week later, on July 5, 2000, on Hudson Ridge, a remote forested area. 1-ER-6. Hudson Ridge is about 10 miles from the Coquille cemetery where Freeman was last seen alive, and where her right shoe was found. *Id.*

Upon examination, bloodstains were identified on the left (Hudson Ridge) shoe. 1-ER-6. Oswald admitted he did not wear gloves when he collected the left (Hudson Ridge) shoe, and he did not secure the crime scene or preserve it for forensic analysis. 1-ER-6-7.

Even though McGuffin's DNA was not found on either shoe, *id.,* investigators made McGuffin a suspect and obtained and executed search warrants on his Mustang, his parents' Thunderbird, and the McGuffin home. *Id.*

On August 3, 2000, Freeman's body was found on an embankment of the Coquille River, about three miles from where Defendant Oswald claims to have found the left (Hudson Ridge) shoe. 1-ER-7.

McGuffin was targeted as the sole suspect in Freeman's murder, and the initial investigation "included interviews of dozens of witnesses, DNA testing of Freeman's shoes and clothing, polygraph examinations, forensic testing of physical evidence including McGuffin's property and

10

vehicles, and DNA swabs from persons of interest." 1-ER-7. No charges were filed against McGuffin and the case went cold. *Id.*

### C. The HIT Team Continues To Pursue McGuffin, And Suppressed Evidence

The District court's decision mentions the "HIT Team" and their notes, 1-ER-16, 18, 23, 25-26, 30-31, 33. Plaintiffs' evidence contextualizes these references, including:

In the years after Freeman's murder and the case having gone cold, personnel from multiple agencies in the area—the CPD, the Coos CCSO, the City of Coos Bay PD ("CBPD"), and the Oregon State Police ("OSP")—formed an investigative team known as the "HIT Team," which jointly worked to pursue charges against McGuffin. 6-SER-1519. Aside from Oswald, all appealing Defendants were part of the HIT Team. 1-SER-273.

Under intense community pressure to solve the crime, the HIT Team and other officers fabricated evidence, suppressed exculpatory DNA results, destroyed evidence, and coerced witness testimony in an effort to prosecute and convict McGuffin. 6-SER-1519. Some examples include: fabricating a report that McGuffin failed a polygraph a week after Freeman's disappearance; suppressing confirmation that

11

McGuffin was using a payphone across town at the same time they alleged he was driving his car toward his parents' house five miles away to switch cars after the murder; suppressing exculpatory DNA evidence from both Freeman's shoes; and threatening to treat McGuffin as a suspect in other murder investigations in Oregon. 6-SER-1520-1523.

The HIT Team took notes of some of their witness interviews, and other activities. 1-SER-273; 3-SER-726, 761, 799, 810; 4-SER-978. These notes were not disclosed to McGuffin or even the prosecutor once McGuffin was later charged with murder for Freeman's death. *See* 1-ER-23, 25, 27; 3-SER-610.

In 2008, nearly a decade after Freeman's disappearance, Mark Dannels was hired as CPD Chief based, in part, upon his pledge to reopen the Freeman investigation. 6-SER-1523. Dannels knew there was tremendous pressure to solve the Freeman murder and re-convened the HIT Team to prepare a case against McGuffin. 6-SER-1523.

There were no eyewitnesses to Freeman's disappearance or death; there has never been any trace forensic or tangible evidence of any kind connecting McGuffin to the crime; and McGuffin had a corroborated alibi covering the hour during which Freeman is known to have

12

disappeared. 6-SER-1519. Because of this known objective evidence, and because of the simple fact that McGuffin did not commit the murder, the HIT Team struggled to establish a coherent narrative that would justify an indictment. 6-SER-1523. The HIT Team's own meeting notes acknowledge that their theory was unsound, questioning how McGuffin could possibly have committed the murder, and noting an inability to bolster their fabricated "vehicle switch" theory. 6-SER-1523-24. Undisclosed notes from 2009 explain that the team had "followed up on new leads," but "most of the leads have not yielded any results." 6-SER-1524.

### D. The Cold Case Investigators Reopen The Case and Fabricate A False Case Against McGuffin to Charge Him With Freeman's Death

As the District court found, Dannels assembled a team of "Cold Case Investigators," that included Municipal Defendants Dannels, McNeely, Webley, and Sanborn from CPD and three of the four Defendants in this appeal—Zanni from CCSO, Karcher of Coos County Medical Examiner, and Eric Schwenninger from CBPD. 1-ER-8. (Oswald was not a Cold Case Investigator).

In 2009, Chief Dannels communicated with the Vidocq Society, a private organization of "expert investigators" and "confidential consultants," whose claimed mission to help solve cold homicide cases. 1-ER-8; 6-SER-1524. Richard Walter, a discredited "expert" known for fabricating evidence in criminal cases, was a founding member of Vidocq Society. 1-ER-8.

In conjunction the trial court's findings, the evidence shows Chief Dannels and Vidocq worked to develop a theory of motive, a fake "profile" of the killer that would fit McGuffin, and a narrative implicating McGuffin that could be used to secure an indictment. 6-SER-1524. Chief Dannels falsely told the grand jury that they were able to eliminate all potential suspects except one: McGuffin. 6-SER-1524. Zanni repeated the falsehood. 6-SER-1475 & n.120.

Defendants, along with Walter and the Vidocq Society, constructed a complicated false narrative that McGuffin caught up to Freeman near the cemetery, hit her in the face, murdered her, transported her body ten miles outside of town in his Mustang, dumped her body down the embankment near Lee Valley Road, stood looking over the edge of the embankment at her body, drove home to switch

14

cars, and then drove around town pretending to look for Freeman to establish a false alibi. 1-ER-14; 6-SER-1472. There was no evidence to support any part of this fake story. 6-SER-1475 & n.120.

### E. McGuffin is Subject to Bogus Criminal Proceedings, Wrongfully Convicted, and then Exonerated

More than ten years after Freeman's disappearance, McGuffin was indicted and arrested her murder, despite no physical evidence linking him to the crime. 1-ER-8.

The criminal trial began in 2011 and McGuffin was acquitted of murder but wrongfully convicted of manslaughter by non-unanimous (*i.e.*, unconstitutional) verdict. 1-ER-9 (citing *Ramos v. Louisiana*, 590 U.S. 83, 93 (2020)).

McGuffin was sentenced to 10 years imprisonment, and served nine of those years before the State's disclosure of exculpatory DNA evidence, which had been suppressed by the Oregon State Police Crime Lab ("OSP Lab"), showing that the right (cemetery) shoe contained unidentified male DNA that could not have been McGuffin's, and the left (Hudson Ridge) shoe contained unidentified male DNA that could not have been McGuffin's or Defendant Oswald's. 1-ER-9. The charges were then dismissed. *Id.*

15

McGuffin did not kill Freeman or have anything to do with her kidnapping or disappearance and has "always maintained his innocence," including at sentencing after wrongful conviction. 1-ER-9.

After the trial court's decision below, McGuffin's factual innocence was certified by an Oregon court in a judgment that is not subject to appeal. *See* Plaintiffs' Motion for Judicial Notice, Exhibit 1.

**F. Plaintiffs File This Suit and The Trial Court Finds A Reasonable Jury Can Find Each Municipal Defendant Violated Plaintiffs' Rights**

In this suit, McGuffin alleges, among other things, the Municipal Defendants—in conspiracy with one another—violated his constitutional rights.

Like other defendants, the Municipal Defendants moved for summary judgment. 7-SER-1780-1838. Plaintiffs responded by providing an inter-related statement of facts that spanned four separate briefs. *See* 6-SER-1505-62 (response to State Defendants' SJ); 5-SER-1336-83 (response to Walter SJ); 5-SER-1384-1441 (response to Vidocq SJ); 5-SER-1442 to 6-SER-1504 (response to Municipal Defendants' SJ). In so doing, Plaintiffs cited to evidence in nine of Defendants' exhibits,

16

6-SER-1563 to 7-SER-1779, and submitted 97 additional exhibits. *See* 1-SER-91 to 5-SER-1335.

In replying below, aside from two exhibits related to Karcher, the Municipal Defendants did not address any of the remaining 95 exhibits Plaintiffs proffered. 1-SER-69, 1-SER-71 (DKT 337, at 11 and 13). Nor did Defendants cite *Scott v. Harris* or argue Plaintiffs' version of events—expressed over several briefs and hundreds of record citations—was "blatantly contradicted" by other evidence. 1-SER-55-90.

In the end, it was the Defendants who "repeatedly failed to support their arguments with citations to evidence in the record or to address the facts in the light most favorable to Plaintiffs." 1-ER-11.

In assessing a huge record, the trial court found there are "numerous examples of evidence from which a reasonable jury could conclude that *each* of the Municipal Defendants participated in the deprivation of Plaintiffs' rights." *Id.* (emphasis added); *see also* 1-ER-52 (using similar language). The trial court also concluded "Defendants . . . Karcher, . . . Oswald, . . . Schwenninger, . . . [and] Zanni . . . were *each* on notice that the conduct detailed above, when viewed in the light most

17

favorable to Plaintiffs, violated the constitution." 1-ER-54 (emphasis added).

On appeal, Defendants' Excerpts of Record on appeal include only 5 of the 97 exhibits proffered by Plaintiffs below. *Compare* 1-SER-102 to 5-SER-1335, *with* 2-ER-147-55, 2-ER-280-336. Defendants also failed to include the nine exhibits they themselves submitted below, and to which Plaintiffs cited in their own summary judgment briefing. *Compare* 6-SER-1563-77, 6-SER-1578–79, 6-SER-1580-1683, and 6-SER-1684–88, 6-SER-1689–1700, 6-SER-1701–25, 6-SER-1726–47, 6-SER-1747–1763, and 7-SER-1765–1779, *with* ER Index (not including these items).

In its order, the district court addressed Plaintiffs' claims, beginning with fabrication of evidence. The trial court recognized Plaintiffs allege a form of conspiracy and found: "[e]ach piece of evidence in the record adds to a constellation that only a jury can interpret," given that the "evidence creating a dispute of fact about whether the Municipal Defendants fabricated evidence meets the minimum sufficiency to survive summary judgment." 1-ER-11.

As to Plaintiffs' fabrication claims, the District court emphasized that its findings were non-exhaustive examples of direct and circumstantial fabrication from the "voluminous" record at summary judgment. 1-ER-11. Some examples include: (1) fabrication of evidence about blood on Freeman's shoes, (2) fabrication of a police report suggesting that McGuffin switched cars, (3) fabrication of witness statements to support the false narrative that McGuffin switched cars after the murder, (4) fabrication that a witness saw McGuffin with Freeman after 9:00 p.m. the night she disappeared, (5) fabrication that McGuffin's Mustang had been sanitized to cover up evidence of the murder, (6) fabrication that McGuffin dumped Freeman's body hastily by rolling it down the embankment, and (7) fabrication that McGuffin stood at the edge of the road looking down at Freeman's body on the embankment. *See* 1-ER-13-28.[5]

Regarding the failure to disclose favorable evidence, the District court again found "the Municipal Defendants fail to address the

---

[5] Plaintiffs' response briefs, and evidence submitted and cited therein, contain additional examples of evidence fabrication as part of the conspiracy to wrongfully convict McGuffin. *See, e.g.,* 6-SER-1520-24, 5-SER-1455-75, 5-SER-1394-99, 5-SER-1348-52; *cf.* 3-SER-632.

evidence in the light most favorable to the nonmoving party[,]. . . [and they] improperly draw inferences in their own favor." 1-ER-29. The court specified that "Schwenninger and McNeely failed to disclose Zanni's report that Bryant had learned details about the Freeman case from his stepfather, Hall." 1-ER-31. It found that Plaintiffs "have met their burden of showing disputes of material fact precluding summary judgment on Plaintiffs' claims for the withholding and suppression of evidence . . .." 1-ER-31.

As for destruction of evidence, the court echoed again, "[t]he Municipal Defendants ignore their burden of addressing the evidence in the light most favorable to Plaintiffs . . . ." 1-ER-34. For example, the District court concluded that, "[d]rawing all reasonable inferences in favor of Plaintiffs, a jury could conclude that Karcher destroyed the Crime Scene Video." 1-ER-36.

Given these findings, the trial court found sufficient evidence of conspiracy, and of a failure to intervene by each of the Municipal Defendants.

The district court also denied summary judgment as to Plaintiffs' claims for violation of the constitutional right to familial association. 1-

20

ER-51. Over more than two decades, Defendants' conduct and participation in the conspiracy to wrongfully convict McGuffin denied McGuffin and his daughter the care, comfort, consortium, love, and emotional support of their familial relationship. 1-ER-49. The district court found that issues of fact preclude summary judgment on whether Defendants acted in a deliberately indifferent manner and thus the court denied summary judgment. 1-ER-50. Accordingly, because the conspiracy largely occurred during the cold case investigation after S.M. was born, a reasonable jury could conclude that the conspiracy to wrongfully convict McGuffin constituted deliberate indifference and therefore violated S.M.'s rights to familial association. 1-ER-51.

## SUMMARY OF THE ARGUMENT

This appeal should be dismissed for lack of jurisdiction. It is established that "'[a] public official may not immediately appeal 'a *fact-related* dispute about the pretrial record, namely, whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial.'" *Est. of Anderson v. Marsh*, 985 F.3d 726, 731 (9th Cir. 2021) (quoting *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018) (quoting *Johnson v. Jones*, 515 U.S. 304, 307 (1995)). Defendants

21

may not "to evade *Johnson*'s jurisdictional bar by characterizing their arguments as legal ones." *Peck v. Montoya*, 51 F.4th 877, 886 (9th Cir. 2022). But that is precisely what Defendants attempt to do here.

Despite the fact their brief is structured as if it were about qualified immunity, Defendants have failed to raise an abstract issue collateral to the merits that invokes interlocutory jurisdiction. Instead, Defendants blatantly attack the trial court's factual findings, and even ask this Court overrule the trial court's (unreviewable) determinations while construing the facts in their favor based on a fraction of the record below.

In attempting to obtain jurisdiction, Defendants assert the trial court's findings are "blatantly contradicted" by the record pursuant to *Scott v. Harris*, 550 U.S. 372 (2007). The argument is baseless. For one, Defendants forfeited this issue below. Then, they forfeited it again by not presenting this Court with the summary judgment record. Defendants cannot reasonably claim Plaintiffs' version of events is "blatantly contradicted" by the evidence, while refusing to present this Court with Plaintiffs' version of events and the evidence that supports it. Regardless, this is not a case where there is video or other objective

22

and irrefutable evidence that could even hypothetically apply. Indeed, the claim is simply wrong: the trial court's findings, which drew from and cited a voluminous record, are amply supported by the evidence.

Assuming *arguendo* this Court had jurisdiction, Plaintiff's claims involve constitutional rights that have long been clearly established. It Officials may not fabricate, suppress or destroy evidence in a criminal case or use fabrications to obtain "probable cause." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-76 (9th Cir. 2001) (en banc); *Branch v. Tunnell*, 937 F.2d 1382, 1387 (9th Cir. 1991); *Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997), *as amended* (Oct. 9, 1997); *Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997).

As it pertains to S.M.'s claims, Defendants effectively ask a panel of this Court to overrule what is clearly established law in this Circuit. The law in this Circuit was clearly established at the time of the events in question, this panel cannot overturn circuit precedent, and that precedent is sound anyway.

Dismissal or summary affirmance is warranted to avoid further burdens on the judicial system and ongoing prejudice to Plaintiffs.

23

## ARGUMENT

**I.**     **This Appeal Should Be Dismissed Because Defendants' Arguments Exceed This Court's Limited Jurisdiction**

Defendants bear the burden of establishing this Court has interlocutory jurisdiction. *Melendres v. Maricopa Cnty.*, 815 F.3d 645, 649 (9th Cir. 2016). They have utterly failed.

### A.   Appellate Jurisdiction Over Interlocutory Appeals Is Narrow and Strictly Conscribed

Congress limits appellate jurisdiction to "final decisions" of lower courts. 28 U.S.C. § 1291. Under the collateral order doctrine, non-final decisions may be immediately reviewed if the decision: (1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) once made, is effectively unreviewable on appeal from the final judgment. *Johnson*, 515 U.S. at 310.

Orders denying summary judgment involving assertions of qualified immunity often fall within the collateral order doctrine. *Estate of Anderson v. Marsh*, 985 F.3d 726, 730 (9th Cir. 2021). However, the scope of review is "circumscribed," *Foster v. Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018), and strictly limited to the "purely legal question of

24

whether the facts alleged by the plaintiff demonstrate a violation of clearly established law." *Hernandez v. San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018).

This Court does not have interlocutory jurisdiction to consider "a fact-related dispute about the pretrial record, namely, whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial." *Foster v. Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018) (citations omitted). As a result, "[a] district court's determination that the parties' evidence presents a genuine issue of material fact is *categorically unreviewable* on interlocutory appeal." *Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009) (emphasis added). Jurisdiction is lacking where an appellant contests "whether there is enough evidence in the record for a jury to conclude that certain facts . . . are true[.]" *Estate of Anderson*, 985 F.3d at 734 (citations omitted).

Defendants may not "attempt to evade *Johnson*'s jurisdictional bar by characterizing their arguments as legal ones." *Peck v. Montoya*, 51 F.4th 877, 886 (9th Cir. 2022)). Courts must, therefore, look beyond labels and to the substance of an argument, as defendants may not establish appellate jurisdiction by attempting to couch what is really a

25

factual dispute as a legal one. *See George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013) (holding no appellate jurisdiction where defendants-appellants framed the issue as a reviewable "materiality" challenge, where it was really an unreviewable sufficiency-of-evidence challenge).

When an interlocutory appeal exceeds jurisdiction, dismissal is required. *See, e.g.*, *Marsh*, 985 F.3d at 734; *Fatai v. Ramos*, No. 23-15354, 2024 WL 863360, at *1 (9th Cir. Feb. 29, 2024).

## B. Defendants' Impermissible Fact-Based Challenges Exceed Appellate Jurisdiction, Requiring Dismissal

The exception to the normal rule prohibiting appeal before trial operates properly only if defendants accept the plaintiffs' facts and ask whether the rights at issue are clearly established. *Adams v. Speers*, 473 F.3d 989, 991 (9th Cir. 2007). Defendants have failed to follow this rule and instead contest the facts found below. Dismissal is required.

Here, the trial court concluded there are "numerous examples of evidence from which a reasonable jury could conclude that *each* of the Municipal Defendants participated in the deprivation of Plaintiffs' rights," 1-ER-12 (emphasis added), and specifically identified each named defendant here. *E.g.*, 1-ER-41-44.

26

Though findings are categorically unreviewable, *Eng*, 552 F.3d at 1067, the central premise of Defendants' brief is to contradict the trial court's findings, as illustrated here:

| District Court Findings | Defendants' Opening Brief |
| --- | --- |
| The original report from the criminalist in charge of the scene did not state that Freeman's body was rolled down the embankment. 1-ER-24-25.<br><br>The autopsy report described in detail the positioning of Freeman's body and is inconsistent with Karcher's testimony at the grand jury proceedings about the position of Freeman's body. 1-ER-25. | Karcher's testimony about the position of Freeman's body cannot be the basis of a fabrication of evidence claim because there is no evidence in the record that it was fabricated. OB28.<br><br>It is indisputable that when found, Freeman's body position was as Karcher described. OB31-32. |
| There is sufficient evidence for a jury to conclude that Defendant Karcher participated in the fabrication of evidence that McGuffin dumped Freeman's body down an embankment and looked down at the body. 1-ER-24-26. | Karcher did not fabricate evidence regarding the position of Freeman's body. OB28.<br><br>Karcher did not fabricate evidence of a path through the foliage where Freeman's body was found. OB34. |
| While Karcher is immune from liability for her in-court testimony, the discrepancies between the HIT Team notes, the grand jury testimony, and her | Further, the existence of the disturbed foliage in the photograph, and the fact the disturbed foliage was referred to by Pex and Wetmore, proves that |

| | |
|---|---|
| deposition testimony could show that she conducted the investigation with a reckless disregard for the truth, constructing a false narrative that carried through to the State's theory of the case at trial. 1-ER26. | the testimony of Karcher was not only true, but that her testimony did not cause the conviction of McGuffin. OB36. |
| A reasonable jury could find that Karcher's testimony contributed to a false narrative that was used by the State throughout trial to convict McGuffin. 1-ER-26. | Even if Karcher did fabricate evidence, her testimony did not cause the conviction of McGuffin. OB32. |
| In 2010, Defendants Schwenninger and McNeely reached out to Defendant Hall, who was no longer working for the CPD, to see if he had any suggestions for aiding in the Cold Case Investigation. Hall suggested that they approach Bryant to see if Bryant would cooperate with their efforts to bring charges against McGuffin. 1-ER-27. | There is no causation or connection between Schwenninger's phone call to Hall and Bryant's testimony. OB38–39. |
| When testifying at the criminal trial in 2011, Bryant gave a slightly altered testimony, suggesting that McGuffin had actually seen Freeman's body and knew how it was positioned. 1-ER27. | Bryant never testified that McGuffin told Bryant that McGuffin knew the location of Freeman's body and how it was positioned before it was found. OB39. |

28

| | |
|---|---|
| Schwenninger and McNeely failed to disclose Zanni's report that Bryant had learned details about the Freeman case from his stepfather, Hall. 1-ER-31. | There is no evidence in the record that Schwenninger had or knew about [Zanni's] report. OB51. |
| Oswald, who found Freeman's left shoe on Hudson Ridge, testified in deposition for this case that he also found cigarette butts, paper, cans, and a piece of string which he collected with gloves and placed in a bag with Freeman's left shoe . . . There is no record that Oswald turned in these items. 1-ER-30.<br><br>A jury could conclude that Oswald suppressed the fact that he failed to properly collect or preserve potentially key pieces of evidence found by Freeman's left (Hudson Ridge) shoe or that he destroyed the evidence. 1-ER-31. | The first problem with this is that the record shows Oswald did collect and turn in other items found near the left shoe. There is no evidence that any items were collected and not turned in, let alone any evidence to suggest the items were exculpatory. OB58–59. |
| Because the Original Investigation took place over many months and the Cold Case Investigation took place over several years, there is evidence in the record from which a jury could conclude that each Municipal Defendant was aware of the suppression and fabrication of evidence in violation of McGuffin's constitutional rights and realistically "had an opportunity | The district court did not cite one fact to show where Karcher, Oswald, Schwenninger, or Zanni had an opportunity to intervene, much less a fact showing they were required to intervene. OB54. |

29

| | |
|---|---|
| to intercede." 1-ER-45. | |
| "On this record, a jury could also find that the Municipal Defendants were acting in bad faith and destroyed evidence of their wrongdoing. In addition to the examples that stem from the fabrications and suppression described above, a jury could find that Defendant Kris Karcher (a Deputy Medical Examiner with the Coos County Sherriff's Office) destroyed the only copy of a video recording documenting the crime scene where Freeman's body was found." 1-ER-34-35 | "Karcher is entitled to qualified immunity under the first or second prong of the immunity inquiry, because drawing only reasonable inferences in Plaintiffs' favor, the very most that can be shown is that Karcher negligently or inadvertently lost the video tape." OB58. |

There is no jurisdiction here.

### C. Though Framed As Arguments About Qualified Immunity, Defendants' Arguments Are Actually Challenges About the Facts To Be Proved At Trial

Defendants' fact-based challenges cannot be separated from their purported assertions of qualified immunity. Although a hypothetically permissible argument on for interlocutory appeal can no clearly established law put the Defendants on notice their conduct was unconstitutional, only a few paragraphs of Defendants' 68-page brief mention this argument. Even still, these arguments remain fact-based challenges that exceed interlocutory jurisdiction.

30

For example, as it relates to Karcher, Defendants argue there is no clearly established law that it is unconstitutional to correctly describe the scene of a crime in a way that does not implicate any individual. OB37. This argument is premised on the factual assertion that Karcher's account was correct and not fabricated. Indeed, the District court found the opposite. 1-ER-53–54.

The same is true with regard to Schwenninger. Here, Defendants argue that there is no clearly established law that an officer can be held liable for fabricating witness statements when the officer never spoke to the witness and the testimony is true. OB50. But, Plaintiffs' contention is that the witness's account—of Bryant suggesting non-public details about the crime came from McGuffin—is not true because the information came from the witness's stepfather, Hall, who had been the lead investigator on the case. *See* 1-ER-27-28. And, consistent with the trial court's findings, *id.,* Plaintiffs do not accept that Schwenninger could not have influenced the witness, either by speaking with him directly or working with another officer (McNeely) to generate the bogus account Bryant provided in criminal proceedings. Plaintiffs thus cited Schwenninger's own Case note, as well as McNeely's note, which the

31

City of Coquille admitted were authored by each officer, respectively. 6-SER-1474 & n.116. These sources show the contact with Hall about Bryant and extensive work between McNeely and Schwenninger. 3-SER-801-08. The notes do not describe the entirety of the interactions between McNeely, Schwenninger, and Bryant but that is the point—the interactions were hidden. In addition, a "nonmoving party may rely on circumstantial evidence to defeat a motion for summary judgment," *Holley v. Techtronic Indus. N. Am.*, 812 F. App'x 517, 517 (9th Cir. 2020); *see Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1095 (9th Cir. 2005) (same).

Accordingly, this is not an issue about qualified immunity, it remains a circular, cursory, and invalid argument, 1-ER-54, that contests the finding that a "jury must decide whether Hall, Schwenninger, and McNeely fabricated evidence by eliciting Bryant's allegedly false testimony." 1-ER-28.

In the section regarding Defendant Oswald, again recharacterizing their factual arguments, Defendants argue that there is no clearly established law that an officer can be held liable for failing to preserve items of no known evidentiary value before a prosecution is

32

initiated. OB59. But the trial court's findings and immunity analysis belie this contention; as the trial court recognized, it is the "destruction of evidence of *apparent exculpatory value*" that was "established before the Freeman investigation." 1-ER-53 (citing *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988)). The trial court recognized the *mens rea* requirement for Due Process claims involving destruction of evidence, 1-ER37 (citing *California v. Trombetta*, 467 U.S. 479, 486 (1984), and *Youngblood*, 488 U.S. at 58), and found that standard met. 1-ER-31.

Defendants' assertions of qualified immunity below were fact-based challenges, where the Defendants denied wrongdoing. 1-ER-54. As below, the issue presented is not about whether any right was "clearly established"; it about Defendants urging a court to make factual findings by weighing the evidence in the record *against* the non-movant.

### D. Defendants Cannot Challenge the District Court's Factual Findings Writ Large By Claiming They Are Blatantly Contradicted By the Record

Defendants attempt to evade the limits of interlocutory appeal— and suggest this Court should construe the evidence against Plaintiffs— by drawing on *Scott v. Harris*, 550 U.S. 372 (2007).

33

*Scott* held that when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 379. *Scott* pertains to things like video recordings irrefutably demonstrating that an assertion by a party *cannot* be true. *See, e.g.,* *Hernandez v. Town of Gilbert*, 989 F.3d 739, 746 (9th Cir. 2021) ("[W]e are not required to accept a non-movant's version of events when it is clearly contradicted by a video in the record." (cleaned up)).

For at least four reasons, Defendants' invocation of *Scott* is misplaced and fails.

First, Defendants cannot possibly invoke *Scott* because they forfeited the issue by not raising it below. Arguments raised for the first time on appeal are deemed forfeited. *Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018). In their reply below, Defendants did not cite *Scott* or argue Plaintiffs' version of the facts is "blatantly contradicted" by a videotape or any other irrefutable evidence. 1-SER-55–90. Instead, as the trial court found, Defendants themselves repeatedly failed to adequately support their assertions with record citations. 1-ER-11.

34

Second, contrary to what appears to be the animating notion in Defendants' brief, *Scott* did not make a broad exception to the jurisdictional rules above. *Scott* does not permit courts to expand interlocutory jurisdiction or to construe an entire record of evidence against the non-movant. Rather, *Scott* created a "narrow additional avenue" to argue that objective evidence, such as a videotape, "quite clearly contradict[ed] the version of the story told by [the plaintiff]." *Marsh*, 985 F.3d at 732 n.3. There is no such evidence here. There is no videotape, audio recording, or any other objective and irrefutable evidence that contradicts Plaintiffs' version of the facts, and Defendants cannot reasonably assert otherwise. Moreover, there is specific evidence supporting Plaintiffs' position, discussed below.

Even in cases where *Scott* could apply, it is limited to the specific facts that are blatantly contradicted by indisputable evidence. So, for example, a court may not disregard the portions of testimony that are not "blatantly contradicted" by a video or other evidence "capable of objectively disproving witness testimony." *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022); *see also, e.g., Sanchez v. City of Hawthorne*, 644 F. App'x 756, 757 (9th Cir. 2016) (even where video

35

contradicts one allegation that does not mean "the jury could not believe other parts of [the testimony" and so *Scott* did not apply to the non-contradicted facts).

Third, Defendants have forfeited argument again by failing to provide this Court with the record on which the trial court relied when it decided summary judgment. As a general matter, when a party "attacks a District Court's findings on appeal, [they] must include in the record all of the evidence on which the District Court might have based its findings." *Thomas v. Computax Corp.*, 631 F.2d 139, 141 (9th Cir. 1980) (citing *Watson v. Button*, 235 F.2d 235, 238 (9th Cir. 1956)); *see also, e.g.*, *Jensen v. United States*, 326 F.2d 891, 893 (9th Cir. 1964) (refusing to consider appellant's assertion the district court's findings were clearly erroneous for failure to provide the record on which the court based its findings).[6]

Defendants' ER do not include the full summary judgment record below pertaining to their own motion. So far as Plaintiffs can tell, the

---

[6] The principle expressed in these cases, which arise from discussion of Federal Rule of Appellate Procedure 10(b)(2), is applicable here given that Defendants attack the trial court's findings of fact but have failed to provide this Court with the decisional record that precipitated the findings they now challenge.

Defendants' ER does not appear to have any particular rhyme or reason, other than being a self-serving hodge-podge of some of the evidence below, omitting the bulk of evidence Plaintiffs presented or cited below.[7] As a result, the Opening Brief does not—and cannot possibly—discuss the record relied upon by the trial court or that Plaintiffs pointed to in responding to summary judgment. Because they cannot do so for the first time in reply, *see United States v. Patterson*, 230 F.3d 1168, 1172 (9th Cir. 2000), the argument is (doubly) forfeited.

Fourth, claiming there is "no evidence" in the face of a mountain of evidence does not "blatantly contradict" Plaintiffs' version of events, or create jurisdiction in this Court.[8] As the district court noted, the

---

[7] In the Supplemental Excerpt of Record, Plaintiffs have provided the evidence they pointed to below, including in their response, 1-SER-91, 6-SER-1562, and exhibits submitted by the Defendants themselves. *See* 6-SER-1563, 1779. Defendants did not even provide all of the evidence *they* submitted that Plaintiffs pointed to in their opposition to summary judgment. *Compare* 5-SER-1336, 6-SER-1562 (Plaintiff's briefs citing some evidence Defendants provided)), *with* 6-SER-1563-67, 7-SER-1779 (providing that evidence here).

[8] To the extent Defendants claim jurisdiction exists because there is *no* evidence in support of Plaintiffs' claims, *see*, *e.g.*, OB3 (framing the issues on appeal as involving "no evidence"), *see Marsh*, 985 F.3d at 732 n.3, these assertions are belied by the district court's extensive discussion of the evidence, the sheer magnitude of the evidence Plaintiffs presented below, and as discussed *infra* 55-67.

37

"record before the Court on summary judgment easily exceeds 10,000 pages of exhibits," and the court below provided detailed citations to the record throughout its opinion, including in reaching conclusions that there is sufficient evidence for a reasonable jury to find *each* Defendant violated Plaintiffs' rights. 1-ER-11.

The district court discussed evidence pertaining to each appealing defendant, *e.g.*, 1ER-24-26, 31, 35-37 (Karcher); 1-ER-24-27, 32-34 (Zanni); 1-ER-6-7, 30-31, 43, 47-48 (Oswald); 1-ER-26-28, 31 (Schwenninger). Plaintiffs, in opposing summary judgment and providing their version of events, also provided extensive citations to the evidence in the record as it pertains to each appealing defendant. *E.g.*, 6-SER-1472-74, 1478 (Karcher); 6-SER-1474-75, 1483, 1493 (Zanni); 6-SER-1475, 1482, 1488; (Oswald); 6-SER-1474, 1482, 1495 (Schwenninger).

Defendants simply refuse to accept the reality of the genuine disputes in the record, and they ask this Court, as they asked the trial court below, to construe the evidence in their favor. Moreover, they ask this Court, as they asked the trial court below, to ignore Plaintiffs' evidence that contradicts the Defendants' assertions. The trial court

38

found that the evidentiary failure below was that of *Defendants* not of Plaintiffs, *e.g.,* 1-ER-12, 29, 34, 35, 43, 44, 46, and Defendants' errors persist before this Court. Dismissal is warranted.

## II.     Even Assuming Jurisdiction, Plaintiffs' Claims Involve Clearly Established Constitutional Rights

The jurisdictional defects in this appeal are sufficient to require dismissal. However, assuming *arguendo* that this Court could consider the issue, there should be no question that Defendants' actions violated Plaintiffs' constitutional rights. No reasonable officer would believe they could fabricate evidence, suppress exculpatory evidence, fabricate witness testimony, or destroy the only video recording of a crime scene.

Evaluating a motion for qualified immunity at summary judgment requires the court to view the evidence in the light most favorable to the plaintiff and determine whether (1) there was a violation of a constitutional right, and (2) that right was clearly established at the time of the alleged conduct. *Tolan*, 572 U.S. at 655-56.

Plaintiffs focus on the second question because that is the only hypothetically "purely legal" question that could be reviewed at this interlocutory stage. *Hernandez v. San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018). That question centers on whether the law at the relevant

time gave Defendants adequate notice that their actions were unconstitutional—that is, whether the legal standards in place provided "fair warning" to Defendants. *Tolan*, 572 U.S. at 656 (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)); *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curium) ("[T]he focus" of qualified immunity "is on whether the officer had fair notice that her conduct was unlawful.").

Qualified immunity is an issue of notice. It "attaches when an official's conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (internal citations omitted). "It is not necessary, of course, that the very action in question has previously been held unlawful," and there are circumstances in which there is no "qualified immunity even if there is no reported case directly on point." *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (citations omitted); *see also Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020) (holding "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question") (cleaned up).

### A. It Was Clearly Established By 2000 that Officials Could Not Fabricate Evidence

Defendants contend they are entitled to qualified immunity for the fabrication of evidence claims. OB27.[9] They are mistaken.

---

[9] Defendants are incorrect that Plaintiffs did not present evidence below that Oswald and Zanni fabricated evidence, *see, e.g.*, 6-SER-1475 & n.120; 6-SER-1482 & n.163. The trial Court denied the motion on these claims. 1-ER-62. In addition, even if the trial court had not addressed Zanni and Oswald specifically, summary judgment was inappropriate because (1) the same right to due process is violated by the suppression of favorable evidence just as the fabrication of evidence, and the cases arise from the same line of Supreme Court cases, *e.g.*, *Napue v. Illinois*, 360 U.S. 264 (1959), and *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); (2) both Oswald and Zanni can be liable for the other acts of fabrication undertaken by other Municipal Defendants given their role in a conspiracy with them, *Lacey v. Maricopa County,* 693 F.3d 896, 935 (9th Cir. 2012) (*en banc*) (noting that conspiracy claims may "enlarge the pool of responsible defendants by demonstrating their causal connections to the violation; the fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired"); and (3) both Oswald and Zanni failed to intervene to preclude the use of other fabricated evidence against McGuffin. *See Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir .1994)). Finally, there is additional evidence of fabrication by Oswald—including via his own report (which Plaintiffs proffered within their expert's report). 3-SER-632. Had Defendants made the arguments they now make for the first time on appeal, the record on this point would be more fulsome. But, it was *Defendants'* initial burden, not Plaintiffs, on their motion. *See Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

41

Decades before 2000, it was "virtually self-evident" that fabricating evidence for use in a criminal prosecution violates due process. *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc); *see also Richards*, 39 F.4th at 569-71 (1993 fabrication of evidence was unconstitutional); *Caldwell v. City & Cnty. of San Francisco*, 899 F.3d 1105, 1112 (9th Cir. 2018) (1990 fabrication of notes violated clearly established law).

In short, "'the wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious," and the "right to be free from such charges is a constitutional right." *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010) (quoting *Devereaux*, 263 F.3d at 1074-75 (citing *Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942)).[10]

---

[10] Defendants' citation to a case from the Eastern District of Pennsylvania, citing Third Circuit law, is puzzling and irrelevant. For one, "[t]o determine whether a right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act." *Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 967 (9th Cir. 2010). Courts can look to other circuits only "in the absence of binding precedent." *Id.* Here, there is ample precedent.

42

Defendants do not argue they lacked notice of the prohibition on fabricating evidence. Defendants opt instead to challenge the trial court's findings that a reasonable jury can find each of them fabricated evidence. Again, this is not an appropriate challenge for interlocutory appeal, but Plaintiffs address the trial court's findings below.

### B. It Was Clearly Established by 2000 Officials Have An Obligation to Disclose Favorable Information

The Due Process Clause requires police to affirmatively produce material information—*i.e.,* information that is exculpatory or impeaching—to the accused. *Brady v. Maryland,* 373 U.S. 83 (1963). The elements of a civil *Brady/Giglio* claim against a police officer are: (1) the officer suppressed evidence that was favorable to the accused from the prosecutor and the defense, (2) the suppression harmed the accused, and (3) the officer "acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Mellen v. Winn,* 900 F.3d 1085, 1096 (9th Cir. 2018).

Due Process requires disclosure of information that would "have raised opportunities for the defense to attack the thoroughness and even the good faith of the investigation." *Kyles v. Whitney*, 514 U.S. 419, 445 (1995). This rule has to do with the nature of police work: when "the

43

probative force of evidence depends on the circumstances in which it was obtained, and those circumstances raise the possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it." *Id.* at 446 n. 15

The duty to disclose the *Brady* material at issue here was established decades ago. *E.g., Giglio*, 405 U.S. at 154 (decided in 1972); *Kyles v. Whitney*, 514 U.S. at 419 (decided in 1995). That is why this Court has recognized that the law in 1984, and as far back as 1978, clearly established that police officers are bound to disclose material information. *Carillo v. County of Los Angeles*, 798 F.2d 1210, 1219-25 (9th Cir. 2015) (citing *United States v. Butler*, 567 F.2d 885 (9th Cir. 1978)).

In short, "whether it was clearly established, in 1997, that police officers had a duty to disclose material impeachment evidence to prosecutors" is "not an open question." *Mellen*, 900 F.3d at 1103. That remained true three years later, when Leah Freeman was killed.

There is no abstract question of "clearly established law" here. Defendants merely challenge the trial court's factual findings on this issue and improperly ask this Court to construe the evidence in their favor. Plaintiffs address the individualized findings *infra* 55-67.

44

### C. It Was Clearly Established in 2000 Officials Cannot Destroy Evidence With Apparent Exculpatory Value

Defendants argue that Defendant Karcher is entitled to qualified immunity for destruction of the crime scene video because there is speculation as to the contents, so she could not have acted in bad faith. OB58. The bad faith destruction of evidence that is potentially useful violates Due Process, and that right has been clearly established since 1988. *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333 (1988).

### D. It Was Clearly Established In 2000 That Investigators Cannot Prosecute Someone In the Absence of Probable Cause

There is a single Fourth Amendment claim in this case, which the Supreme Court has now analogized, at least in part, as being akin to "malicious prosecution." *See Chiaverini v. City of Napoleon*, 602 U.S. 556, 556 (2024) (recognizing Fourth Amendment "claims have been analogized to the common-law tort of malicious prosecution"); *Thompson v. Clark*, 596 U.S. 36, 43 (2022); *Manuel v. City of Joliet,* 580 U.S. 357, 364 (2017).

45

Whatever the label, and whatever the precise formulation of elements a Plaintiff must show,[11] the text of the Fourth Amendment prohibits detention in the absence of probable cause, which is the "gravamen" of the claim and has been clearly established since the Founding. *Thompson*, 596 U.S. at 43. This Court has long recognized such claims, including holding that where, as here, probable cause is lacking or fabricated, there is no qualified immunity. *See, e.g., Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991); *Harris v. Roderick*, 126 F.3d 1189, 1205 (9th Cir. 1997); *cf. Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (discussing a prosecution in 2000).

It is also clearly established that even where there might be a rebuttable presumption of probable cause from a grand jury indictment, that can be rebutted by showing, among other things, the "criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Awabdy,*

---

[11] McGuffin has shown favorable termination under Oregon law, 1-ER-57, and under federal law, which does not require an affirmative showing of innocence. *McDonough v. Smith*, 588 U.S. 109, 117 (2019). But, even if McGuffin were required to show the ultimate resolution was indicative of innocence, his state-court judgment of a certificate of innocence—now presented here—satisfies that standard.

46

368 F.3d at 1067; *see also Manuel*, 580 U.S. at 369 n.8 ("Whatever its precise form, if the proceeding is tainted—as here, by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights."). It is also clearly established that prosecutorial independence is not presumed where, as here, there is a showing of fraud or fabrication. *Awabdy*, 368 F.3d at 1067; *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126–27 (9th Cir. 2002); *Harris*, 126 F.3d at 1198.

Defendants' arguments simply challenge the trial court's findings on these issues.

### E. It was Clearly Established in 2000 That Officials Cannot Conspire to Violate Someone's Rights

The cases that demonstrate the clearly established rights to *Brady* disclosures and to be free from criminal charges based on false evidence deliberately fabricated by the government are sufficient to clearly establish civil liability for conspiring to do so. These rights were clearly established prior to 2000. Separately, established law prohibits officials from conspiring to violate an individual's constitutional rights, and did so long before 2000. *See, e.g., Mendocino Envtl. Ctr. v. Mendocino Cty.*,

47

192 F.3d 1283, 1301-02 (9th Cir. 1999); *Ward v. EEOC*, 719 F.2d 311, 314 (9th Cir. 1983).

Defendants do not make any serious argument about the conspiracy claims, OB63, and thus have forfeited any such arguments. *Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010) (refusing to consider summarily raised issue that had no supporting argument); *Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived.").

Forfeiture aside, Defendants complaint that the district court pointed to other Defendants who are "no longer parties" is irrelevant. That other defendants settled does not mean they cease being co-conspirators or that evidence of their misconduct simply vanishes. The trial court's findings—which span several pages, cite the correct legal standards, and compile significant evidence—on this issue are beyond sufficient to affirm (if this appeal is not dismissed for lack of jurisdiction). 1-ER-41-43.

**F. It Was Clearly Established By 2000 Officials Have A Duty To Intervene To Prevent The Violation of Constitutional Rights When they Have The Opportunity to Do So**

Despite Defendants' contentions otherwise, the trial court found that there is sufficient evidence from which a jury could conclude *each* Municipal Defendant was aware of the suppression and fabrication of evidence in violation of McGuffin's rights and had a realistic opportunity to intervene. OB54 (citing 1-ER-44-45 (citing *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000)). *Cunningham* recognized officials "have a duty to intercede when their fellow officers violate the constitutional rights of'" civilians. 229 F.3d at 1289 (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994)). The law was clearly established in 2000.

In the context of a 62-page decision synthesizing a massive record, the trial court's findings were beyond sufficient. No further "individualized analysis" was required given the other facts found by the trial court and its permissible conclusion that there was evidence against *each* Municipal Defendant.

As with the conspiracy claim, a fatal flaw with Defendants' argument on this issue is that they presume the failure to intervene

49

claim can only apply with respect to the four of them, rather than all of the settling officers who, as the trial court found, a reasonable jury can conclude committed misconduct and violated McGuffin's constitutional rights. That Oswald retired in 2006 did not prevent him from intervening to stop fabrications before he retired. The same is true of Zanni. The claim is not that they had some obligation after they lacked an opportunity to intervene; it is that, as officers working on a high-profile case with others, they had the opportunity to prevent misconduct at that time.

Finally, Defendants claim for the first time on appeal that Karcher cannot be liable because, as a medical examiner, she did not have an obligation to intervene to stop a police officer's misconduct. OB55-56 (citing *Musso v. Hourigan*, 836 F.2d 736, 743 (2d Cir. 1988)). The trial court did not address this issue because it was not raised below. In addition, the quote in Defendants' brief is not in *Musso* but does appears in *Phoenix v. Reddish*, 175 F. Supp. 2d 215, 220 (D. Conn. 2001)—an out-of-Circuit-district-court decision that is irrelevant to the clearly-established law question. Even then, *Reddish* says nothing about the duties of a medical examiner working with the police on a

50

HIT Team as part of a cold case squad of law enforcement officers who have conspired to fabricate and/or suppress evidence. The duty to intervene in this sort of misconduct (rather than conspiring to go along with it) was obvious, precluding immunity. *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020).

**G. It Was Clearly Established in 2000 That Officers Cannot Wrongfully Deprive a Child of Their Liberty Interest in the Companionship of the Parent**

S.M. has a fundamental constitutional right to familial association with her father. Defendants violated this right by interfering with that relationship without a legitimate governmental interest.

Nonetheless, Defendants challenge the District court's denial of summary judgment as to S.M.'s claim for violation of her Fourteenth Amendment right to parental companionship. OB19–20. Defendants assert that this Court's precedents established in *Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir. 1987) should be overruled. OB22. The Defendants rely on cases from other circuits and misapply the holding of *Washington v. Glucksberg*, 521 US 702 (1997).

Defendants claim that the existence of a circuit split means that the right cannot be "clearly established." Defs' Br. 21–22. A right is

51

clearly established, however, according to the case law of "the Supreme Court *and Ninth Circuit law existing at the time of the alleged act.*" *Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 967 (9th Cir. 2010) (emphasis added). Courts can look to other circuits only "in the absence of binding precedent." *Id.*

There is binding precedent that covers this exact clearly established right in this Circuit. *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987). Defendants cannot manufacture a lack of clearly established law in the Ninth Circuit by digging around in the Sixth Circuit for more favorable case law. *Smith* is the law in this Circuit. In *Smith*, this Court has said the "constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents." *Id.*

It is clear now, as it was at the time of the conduct, that "[p]arents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. California Dep't. of Corr. & Rehab*, 726 F.3d 1072,

52

1075 (9th Cir. 2013). *Smith* was decided over a decade before Leah Freeman was killed. The circuit split, similarly, did not exist at the time of the investigation.[12] The constitutional right to familial association of a child and her parent was indisputably established by binding circuit precedent at the time of the officers' misconduct and McGuffin's wrongful conviction in 2011.

Even setting aside that Defendants cannot simply will the law of this circuit into being something else, they also misapply the standards in *Glucksberg*. Defendants claim that S.M.'s due process claim "lacks clear historical or textual support." OB22. This is simply wrong.

It is true that substantive due process rights must be "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 720-21. However, to say that familial relationships are not protected under the Constitution is to ignore nearly all jurisprudence surrounding substantive due process. *See e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) ("without a doubt [liberty] denotes not merely freedom from bodily restraint but

---

[12] Defendants cite a 1991 case from the First Circuit, *Pittsley v. Warish*, 927 F.2d 3 (1st Cir. 1991), but that case was overruled. *See Martinez v. Cui*, 608 F.3d 54, 63-64 (1st Cir. 2010).

53

also *the right of the individual to. . .* establish a home and *bring up children*") (emphasis added); *Prince v. Massachusetts*, 321 U.S. 158, 442 (1944) ('[i]t is cardinal. . . that the custody, care, and nurture of the child reside first in the parents"); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116-17 (1996) (the family association of a parent-child bond is "so undeniably important" that its interference demands "close consideration.").

Defendants further argue there is no due process violation because only conduct that "shocks the conscience" can support such a claim, and that defendants' conduct did not shock the conscience. However, deliberate fabrication of evidence shocks the conscience. *See Spencer v. Peters*, 857 F.3d 789, 801 (9th Cir. 2017) ("we believe that no sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence") (internal citations omitted); *Lemire*, 726 F.3d at 1075.

Here, the district court made extensive findings that Defendants fabricated evidence, as discussed below. It is plainly foreseeable that manufacturing evidence against a person will lead to their incarceration. It is foreseeable that incarcerating a parent will interfere with their child's relationship with them. It does not matter whether

54

these Defendants knew of S.M.'s existence.[13] They behaved in a way that shocks the conscience by manufacturing evidence against McGuffin. The damage to S.M. is foreseeable. Therefore, defendants violated S.M.'s right to association with her father, and that right was clearly established at the time of their conduct.

## III. The Trial Court's Individualized Findings Are Amply Supported by the Record

The Defendants assert that the trial court did not make individualized findings that each of the appealing Defendants violated McGuffin's constitutional rights. Defendants' assertion is not correct. The trial court specifically found that "Plaintiffs have presented sufficient evidence from which a reasonable jury could find that *each* of the Municipal Defendants engaged in conduct that violated the constitution." 1-ER-52 (emphasis added). As discussed above, these findings are unreviewable on appeal. *Est. of Anderson v. Marsh*, 985 F.3d 726, 731 (9th Cir. 2021).

Out of an abundance of caution, and though Defendants arguments are forfeited and frivolous, Plaintiffs here demonstrate that

---

[13] Plaintiffs cited evidence that Defendants knew of S.M.'s existence. *See* 6-SER-1495 & n.230.

the trial court's (unchallengeable) findings about each appealing

Defendant are amply supported by the record. 6-SER-1475 & n.120.

### A. The Trial Court Correctly Found that There Is Evidence From Which a Reasonable Jury Could Conclude that Karcher Violated McGuffin's Constitutional Rights

The trial court found facts from which a reasonable jury could

conclude that Karcher fabricated the narrative that Freeman was rolled

down the embankment to create the false impression that McGuffin had

hastily dumped Freeman's body from the road. 1-ER-25. The trial court

supported its findings with citations to Karcher's descriptions of the

body position that were inconsistent with other evidence in the record.

*Id.* Karcher's fabricated theory further bolstered the Municipal

Defendants' false narrative that McGuffin murdered Freeman in town,

dumped the body miles away, and then drove around town to establish

a false alibi.

The trial court also found facts from which a reasonable jury could

conclude that Karcher fabricated evidence of a "path" starting from the

side of the road where, according to Karcher, the vegetation was broken

down such that it looked like someone had walked over to the edge and

looked down, creating the impression that McGuffin dumped the body

56

from the road, went to the edge, and stood looking down at the body. 1-ER-25. The trial court supported its findings with citations to Karcher's prior testimony, as well as admissions she made during her deposition in this case. 1-ER-25. Karcher's false narrative was further bolstered by jailhouse informant Richard Bryant who testified that McGuffin described the position of the body. 1-ER-27. In her deposition in this case, however, Karcher admitted there was no evidence to corroborate the idea that the path was created by a person or that she could tell someone had stood there and looked down. 1-ER-25.

The trial court further found facts from which a reasonable jury could conclude that Karcher suppressed and destroyed evidence that would have undermined her fabricated statements about the body and the crime scene. 1-ER-25. The trial court relied on a handwritten note from the HIT Team that reads "vegetation not broke down by road," undermining Karcher's narrative of a path from the road where tall grass was broken down. 1-ER-25. The trial court also cited to testimony from the prosecutor and the defense attorney who both confirmed the note was never produced to them. 1-ER-25. The trial court further relied on the evidence from which a reasonable jury could conclude that

57

Karcher destroyed the only copy of a video recording documenting the crime scene where Freeman's body was found. 1-ER-35–36. That video would have captured the position of Freeman's body as well as the condition of the vegetation by the side of the road.

The trial court further relied on Karcher's own deposition testimony that she destroyed all of her notes related to the investigation. 1-ER-37. Karcher testified that she could not remember whether she wrote a report or kept any notes, but she cannot imagine *not* having written something. 1-ER-37. Karcher testified that she searched and could not locate any of her documentation. 1-ER-37. Without the crime scene video or any of Karcher's notes or reports, Karcher was free to fabricate a narrative that would implicate McGuffin and bolster the Municipal Defendants' theory of the crime. 1-ER-37. Outright falsehoods are not the only way to fabricate evidence. Fabrication also includes instances where officials "deliberately mischaracterize[] evidence." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017); *cf. Costanich v. Dep't of Social & Health Servs.*, 627 F.3d 1101, 1112 (9th Cir 2010) ("an interviewer who deliberately

58

mischaracterizes witness statements in her investigative report … commits a constitutional violation").

Defendants argue that it was error for the trial court to credit the evidence of Karcher's misconduct, arguing that there is other evidence to the contrary. OB28-31. Defendants' arguments invite this Court to weigh the evidence and construe any contradictions in their favor, which the Court cannot do on summary judgment. The trial court applied the correct standard by viewing the evidence in the light most favorable to Plaintiffs and finding evidence from which a reasonable jury could conclude Karcher violated Plaintiffs' constitutional rights. To the extent Defendants believe conflicting evidence warrants a different conclusion, that argument is for the jury, not the court on summary judgment.

There is evidence sufficient to support the trial court's findings that Karcher violated Plaintiffs' constitutional rights.

59

**B.  The Trial Court Correctly Found that There Is Evidence From Which a Reasonable Jury Could Conclude that Zanni Violated McGuffin's Constitutional Rights**

The trial court found facts from which a reasonable jury could conclude that Zanni suppressed evidence that McGuffin's car was not "wiped clean," and he participated in fabricating the narrative that McGuffin cleaned his car to cover up evidence of the murder. 1-ER-23. The trial court relied on a handwritten note from a HIT Team meeting in which Zanni was a participant, indicating the HIT Team's knowledge of the true condition of the car. 1-ER-23. That note was never produced to the District Attorney. 1-ER-23.

The trial court also found facts from which a reasonable jury could conclude that Zanni suppressed evidence that a jailhouse informant, Richard Bryant, learned information about the case from his stepdad who was the lead investigator on the case. 1-ER-26–27. That information could have been used to undermine Bryant's story that McGuffin had seen Freeman's body and knew how it was positioned. 1-ER-27. It is undisputed that this evidence was never disclosed to the District Attorney or the defense. 1-ER-26–27.

60

There is further evidence in the record to support the trial court's finding that Zanni fabricated and suppressed additional evidence. For example, Plaintiffs submitted evidence that Zanni fabricated the notion that investigators had eliminated all suspects except McGuffin. 6-SER-1475 & n.120. As another example, Plaintiffs submitted evidence that Zanni suppressed the results of a polygraph administered to Defendant Oswald about his potential involvement in Freeman's death. 3-SER-636. As a further example, Plaintiffs submitted evidence that Zanni suppressed his knowledge of the extent to which Defendant Richard Walter was involved in the investigation, despite Zanni's knowledge of Walter's fraud as determined by a prior court. 5-SER-1348-52, 1366-67.

There is evidence sufficient to support the trial court's findings that Zanni violated Plaintiffs' constitutional rights.

### C. The Trial Court Correctly Found that There Is Evidence From Which a Reasonable Jury Could Conclude that Oswald Violated McGuffin's Constitutional Rights

The trial court found facts from which a reasonable jury could conclude that Oswald suppressed the fact that he failed to properly collect or preserve potentially key pieces of evidence found near

61

Freeman's left (Hudson Ridge) shoe or that he destroyed that evidence. 1-ER-29–30.

More specifically, Plaintiffs also contended that Oswald was untruthful about the manner in which he found the shoe, the manner in which he elected not to preserve or document the scene, and that he lied in his own subsequent—and fabricated—report, and about the polygraph test. The inference is that Oswald may have been involved, may have covered for someone else, may have been bribed, or something else. Under no scenario was his accounting honest or reliable. In denying summary judgment, among other things, the trial court relied on the report of Plaintiffs' police practices expert, Russ Hicks, who described in detail Oswald's egregious departures from accepted policing practices, which are relevant to Oswald's credibility and mental state. *Mellen v. Winn*, 900 F.3d 1085, 1101 (9th Cir. 2018).

These failures include Oswald's failure to preserve the crime scene associated with Freeman's left (Hudson Ridge) shoe, despite Oswald's knowledge that the scene was potentially important to Freeman's disappearance. 1-ER-6 and 29–30. The trial court also relied on Hicks' detailed description of physical evidence (*e.g.*, cigarette butts, paper,

62

beer cans, and a piece of string) that Oswald collected from the Hudson Ridge crime scene and destroyed without writing a report to disclose its existence or his knowledge of the evidence. 1-ER-29–30. The trial court found that a reasonable jury could conclude that those items were key pieces of evidence, given the close proximity to Freeman's left (Hudson Ridge) shoe, which contained the presence of male DNA that did not match McGuffin or Oswald, and remains unidentified. 1-ER-29–30.

There is further evidence in the record to support the trial court's finding that Oswald fabricated and suppressed additional evidence. For example, Hicks' report includes Oswald's report of finding the left (Hudson Ridge) shoe, 3-SER-632, which Plaintiffs contend was fabricated, both because it misrepresents the circumstances under which Oswald found the shoe (e.g., the suggestion that Oswald innocently found the shoe in the woods while policing party sites), and the material omissions of the many other things he found at the crime scene. *Cf. Spencer v. Peters,* 857 F.3d 789, 798 (9th Cir. 2017) (fabrication can occur due to misrepresentations); *Liston v. Cnty. of Riverside,* 120 F.3d 965, 973 (9th Cir. 1997) (fabrication can occur via material omissions). Consistent with that, Plaintiffs submitted evidence

from which a reasonable jury could further conclude that Oswald participated in fabricating evidence that the unidentified male DNA on Freeman's shoe came from him, suggesting that it was irrelevant to the murder. 6-SER-1475 & n.120. Plaintiffs also submitted evidence from which a reasonable jury could find that Oswald fabricated evidence that he passed a polygraph about his involvement in Freeman's death. 3-SER-636. A reasonable jury could infer that any statements about Oswald passing the polygraph were fabricated in light of the fact that documentation of the test results were suppressed and destroyed. *Id.*

There is evidence sufficient to support the trial court's findings that Oswald violated McGuffin's constitutional rights.

## D. The Trial Court Correctly Found that There Is Evidence From Which a Reasonable Jury Could Conclude that Schwenninger Violated McGuffin's Constitutional Rights

The trial court found evidence from which a reasonable jury could find that Schwenninger fabricated evidence by coercing Richard Bryant to incriminate McGuffin. 1-ER-26–27. Consistent with the fabricated notion that McGuffin dumped and rolled Freeman's body and then stood at the edge of the road to look down at the body where it landed, Schwenninger worked with other Defendants to elicit false testimony

64

from Bryant—the lead detective's stepson—that McGuffin saw the body. 1-ER-26–27. The trial court relied on Schwenninger's case notes that show that lead detective Hall encouraged Schwenninger to make contact with Hall's stepson, Bryant, despite Bryant's past lack of cooperation or helpful information. 1-ER-26–27. It was only after the communication from Hall to Schwenninger that Bryant changed his story, incriminating McGuffin with statements suggesting that McGuffin saw Freeman's body after the murder. 1-ER-26–27.

The trial court also found evidence from which a reasonable jury could find that Schwenninger then suppressed the evidence that would undermine Bryant's new story. 1-ER-26–27. The trial court relied on a handwritten report by Zanni documenting the HIT Team's knowledge that Bryant had learned information about the case from Hall. 1-ER-26–27. The trial court also relied on Schwenninger's case notes that reveal that Bryant's sudden interest in cooperating came only after Hall encouraged Schwenninger to pursue it. 1-ER-26–27.

Defendants offer an alternative view of the facts, asserting that Schwenninger had nothing to do with Bryant's testimony because they never spoke and that Hall and Schwenninger never worked together.

OB37–38. This argument was already considered and rejected, as a factual matter. The trial court wrote:

> The Municipal Defendants argue that the only evidence that Hall, Schwenninger, and McNeely elicited false testimony from Bryant is that Hall led the original investigation and was Bryant's stepfather. This argument fails to address evidence in the record (Zanni's report) that Bryant knew information about the investigation from Hall and that Hall later told Schwenninger and McNeely that they should interview Bryant to see if he could help. Drawing all inferences in favor of Plaintiffs, a reasonable jury could conclude that Hall disclosed nonpublic information to Bryant about the position of Freeman's body which Bryant used to suggest that McGuffin had seen Freeman's body. A jury must decide whether Hall, Schwenninger, and McNeely fabricated evidence by eliciting Bryant's allegedly false testimony.

1-ER-28.

Defendants cannot contest these findings here on interlocutory appeal. Like a jury, the trial court was entitled to rely upon both direct and circumstantial evidence in assessing the record in this case. *See, e.g., Coghlan*, 413 F.3d at 1095; *Baker v. Roman Catholic Archdiocese of San Diego*, 725 F. App'x 531, 532 (9th Cir. 2018) (reversing summary judgment for failure to "properly consider various pieces of circumstantial evidence").[14]

---

[14] Defendants assert error because the trial court purportedly did not rely on "admissible" evidence. OB7, 36. Plaintiffs do not understand the

There is evidence sufficient to support the trial court's findings that Schwenninger violated McGuffin's constitutional rights.

### E.  Defendants' Fabrications Harmed McGuffin

Defendants also make a number of arguments about "materiality" that, in the end, are about causation. These contentions completely fail.

For one, a "plaintiff need not be convicted on the basis of the fabricated evidence to have suffered a deprivation of liberty—being criminally charged is enough." *Caldwell*, 889 F.3d at 1115 (citing *Devereaux*, 263 F.3d at 1074-75, and NINTH CIR. JUR. INST. § 9.33). As a result, police conduct that becomes part of the "evidentiary record" in the criminal prosecution is sufficient to permit a jury to find causation. *Id.* at 1117. Alternatively, in wrongful conviction cases, causation can be shown where the fabrications are material in the sense they "could

---

argument. First, defendants do not cite any particular evidence they believe is inadmissible. Second, at "the summary judgment stage" courts "do not focus on the admissibility of the evidence's form" but "instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see* FED. R. CIV. P. 56(c). "Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial." *Comite de Jornaleros de Redondo Beach v. Redondo Beach*, 657 F.3d 936, 964 n.7 (9th Cir. 2011). Finally, the Defendants did not object to Plaintiffs' evidence on this basis below, forfeiting the issue.

have affected the judgment of the jury." *Richards v. County of San Bernadino*, 39 F.4th 562, 572 (9th Cir. 2022).

Here, the trial court found the fabricated evidence could have caused McGuffin harm, because it impacted the criminal proceedings (e.g., the evidentiary record) or manifested itself at trial (and thus impacted the jury). Among other things, the fabrications appear in various documents (like the Vidocq Society presentation) that were undisputedly part of the evidentiary record in the case. 1-ER-13; *see also* 6-SER-1475. There is evidence the bogus stories Defendants fabricated—*e.g.*, of dump and roll, of a vegetation path made by a human, and of Bryant suggesting McGuffin saw Freman's body—impacted the criminal proceedings. 1-ER-26; *see also* 6-SER-1475.

Moreover, as the trial court recognized, Plaintiffs submitted evidence to support the claim that the appealing Defendants were part of a larger conspiracy and actively working with their co-conspirators to fabricate and suppress additional evidence that the jury must consider. 1-ER-43; *see also* 6-SER-1487-90.

Plaintiff need not prove the fabrications by the appealing Defendants were the *only* things the jury heard but it is sufficient that

68

the fabrications impacted the proceedings, including by being repeated at trial, which happened here. *Richards*, 39 F.4th at 572.[15]

Finally, Defendants' arguments about causation (and materiality) are quintessential fact arguments for a jury to decide. It is well established that "[c]ausation is an intensely factual question that should typically be resolved by a jury." *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013) (citing *White v. Roper*, 901 F.2d 1501, 1505-06 (9th Cir. 1990)). Accordingly, where reasonable persons could differ on the question of causation, then "summary judgment is inappropriate and the question should be left to a jury." *White*, 901 F.2d at 1506.

Defendants' arguments fail in this regard as well.

---

[15] Defendants cite *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3r. Cir. 2014), OB45-46, and argue that a plaintiff must show that fabrications "could have affected the *outcome* of the criminal case." This standard is not materially different than this Court's standard because what matters is that it *could* have affected the determination of the jury when that fabricated evidence was placed before the jury in the first place. To the extent *Halsey* can be read to impose a different (and speculative) standard about *outcomes*, this Court's binding precedent controls.

## F. Defendants' Suppressions Harmed McGuffin

Defendants argue that the suppression of evidence was not prejudicial or material here. "Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)). Accordingly, Plaintiff "need not show that he 'more likely than not' would have been acquitted had the evidence been admitted. . . . He must only show that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* In determining whether multiple pieces of suppressed evidence are material, the evidence must be considered cumulatively rather than in isolation. *Id.* at 1007 (error to consider "evidence in isolation rather than cumulatively...."); *Kyles,* 514 U.S. at 421 ("[T]the state's obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the government.").

Whether evidence is material also depends on the strength of other evidence used in the criminal proceedings—it might take only a little evidence to disturb an already-weak conviction. *United States v.*

70

*Agurs,* 427 U.S. 97, 113 (1976)) ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."). A reasonable jury in this case could easily find that the evidence on which McGuffin was convicted was weak given McGuffin was acquitted of a more serious offense and convicted by a non-unanimous verdict. 1-ER-9.

In addition, as the trial court found, there are at least seven different ways in which Defendants, acting in conspiracy with one another, suppressed favorable information that, taken together, "could reasonably prove to put the whole case in a different light as to undermine the confidence in the verdict." *Kyles*, 514 U.S. at 435; *see* 1-ER-29-32.

Defendants' contention otherwise is both a challenge to the facts and fails to construe the record in Plaintiff's favor. Defendants' argument fails accordingly.

## CONCLUSION

This appeal should be dismissed or summarily affirmed.

Respectfully submitted,

By: /s/ David B. Owens_____
*Attorney for Plaintiffs-Appellees*

71

72

| MALONEY LAUERSDORF REINER PC<br>Janis C. Puracal, OSB #132288<br>Andrew C. Lauersdorf, OSB #980739<br>1111 E. Burnside Street, Ste. 300<br>Portland, Oregon 97214<br>Telephone: (503) 245-1518<br>Facsimile: (503) 245-1417 | David B. Owens<br>Loevy & Loevy<br>c/o Civil Rights and Justice Clinic<br>University of Washington Law School<br>William H. Gates Hall, Suite 265<br>P.O. Box 85110<br>Seattle, WA 98145-1110<br>(312) 243-5900<br>(312) 243-5902 (Fax) |
|---|---|

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.

This brief contains 13,730 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief (select only one):

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

/s/David B. Owens
*Counsel for Plaintiffs-Appellees*

73

## CERTIFICATE OF SERVICE

I, David B. Owens, an attorney, certify that, on January 21, 2026 I caused the foregoing to be filed via the Court's electronic filing system, which effected service on all counsel of record.

s/ David B. Owens